# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| THE WILLIAM POWELL CO.,, | : | Case No. 1:14-cv-807 |
| | : | |
| Plaintiff**,** | : | Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING DEFENDANTS |
| | : | NATIONAL INDEMNITY COMPANY |
| NATIONAL INDEMNITY CO., *et al*., , | : | AND RESOLUTE MANAGEMENT, |
| | : | INC.'S MOTION TO DISMISS (Doc. |
| Defendants**.** | : | 22.) |

This matter is before the Court on the motion to dismiss, or in the alternative to stay, filed by Defendants National Indemnity Company and Resolute Management, Inc. (Doc. No. 22). For the reasons that follow, Defendants' motion to dismiss is well-taken and is **GRANTED;** Defendants' motion to stay is **MOOT.[1]**

## I. Background

Plaintiff The William Powell Company ("Powell"), an Ohio corporation, has manufactured industrial valves since at least 1846. Complaint ¶ 9. During the period from 1955 to 1977, Powell purchased a series of primary and excess product and general liability insurance policies from General Accident Fire & Life Assurance Corporation ("General Accident"). Complaint ¶ 17. According to the complaint, these insurance policies required General Accident to defend and indemnify Powell against damages resulting from accidents resulting in bodily injury. Id. Powell alleges that these policies cumulatively provide coverage for up to $60 million in claims, not

---

[1] The Court also has pending before it a motion to dismiss filed by Defendant OneBeacon Insurance Company (Doc. No. 17) and a motion to intervene filed by Edward Walton (Doc. No. 33). These motions will be addressed by the Court in separate orders.

including the costs of defense.  Id.  Powell estimates that, including defense costs, the policies have a value of  as much as $180 million.  Id.

Beginning in 2001, numerous individual plaintiffs began to sue Powell for asbestos-related injuries that allegedly were caused by asbestos in Powell valves.  Complaint ¶ 16.  Powell claims to have been sued by asbestos plaintiffs in 37 states and Canada.  Id.  As a result of these lawsuits, Powell began to piece together its insurance coverages.  Id. Complaint ¶ 17.  Powell learned that, through a series of corporate mergers and asset sales, the policies it purchased from General Accident were eventually assumed by Defendant OneBeacon Insurance Company ("OneBeacon"). Complaint ¶ 19.  OneBeacon is alleged to be a Pennsylvania corporation with its principal place of business in Boston, Massachusetts.   Complaint ¶ 12.

OneBeacon, in turn entered into a reinsurance agreement with Defendant National Indemnity Company ("NICO").  Complaint ¶ 20. NICO is alleged to be a Nebraska corporation that is wholly-owned by Berkshire Hathaway, Inc.  Id.  This was not a typical reinsurance agreement according to the complaint, however.  Instead of prospectively agreeing to indemnify OneBeacon against claims, the complaint alleges that NICO purchased OneBeacon's claims reserves for $2.5 billion and then agreed to reimburse OneBeacon for claims and defense costs up to $2.5 billion.  Complaint ¶ 21.

NICO also acquired responsibility for handling and adjusting all of OneBeacon's claims. Id.  NICO, however, delegated its claims handling responsibilities to Ken Randall America ("Ken Randall") and then to Cavell America ("Cavell").  Complaint ¶ 22.  In 2006, NICO delegated claims handling to Defendant Resolute Management, Inc., a Delaware corporation ("Resolute").  Resolute is also wholly-owned by Berkshire Hathaway.  Id.

The complaint alleges that NICO and Resolute combined to form a racketeering enterprise for the purpose of depriving Powell of its insurance coverage and to profit at Powell's expense. Complaint ¶ 24. Because NICO owns OneBeacon's claims reserves, the complaint alleges that NICO is motivated to maintain control of those reserves in order to earn money on the "float" the reserves generate. Therefore, the complaint alleges, in order to maximize its profits from the float, NICO instructs Resolute to deny and delay claims payments to insureds like Powell without regard to the validity of the policyholder's claims. Additionally, NICO allegedly sets limits on the amount of claims payments Resolute can make based on its own financial goals rather than on the value of policyholders' claims. Complaint ¶ 26-27. Stated another way, the complaint alleges that NICO does not want to pay out the claims reserves it bought from OneBeacon and uses Resolute to hinder, delay, and frustrate payment of legitimate claims from policyholders. The complaint alleges that NICO and Resolute formed this alleged racketeering enterprise in 2006. Complaint ¶ 22.

Powell alleges that its asbestos claims handling went smoothly under the direction of Ken Randall and Cavell. Complaint ¶ 28. Things were allegedly different, however, once Resolute took over Powell's claims. Complaint ¶ 29. Powell alleges that Resolute took a number of acts at NICO's direction in derogation of its rights under the various insurance policies, all for the alleged purpose of eroding its insurance coverage and increasing NICO's profits. Among other things, Powell alleges that:

1. Resolute began to delay payments to local defense counsel and to fund settlements;

2. Resolute attempted to curtail local defense counsel's activities and changed Powell's national coordinating counsel without consulting Powell;

3. Resolute began increasing the rates and amounts of settlements in order to curtail, reduce, and exhaust Powell's policy limits;

4. Resolute disputed the terms and limits of Powell's coverages under the policies;

5. Resolute rejected numerous suggestions from Powell for improving the defense of its cases in order not to reduce the float;

6. Resolute limited local defense counsel's ability to investigate exposure dates;

7. Resolute failed to timely notify Powell of coverage decisions;

8. Resolute unilaterally made decisions that impaired Powell's defense;

9. Resolute unilaterally authorized settlements;

10. Resolute failed to keep Powell apprised of settlement developments;

11. Resolute refused to fund settlements and to pay the invoices of local defense counsel;

Complaint ¶¶ 29-37. Powell alleges on information and belief that Resolute took these actions at NICO's direction. Id. ¶ 37. Furthermore, Powell alleges that Resolute used interstate communications in the form of emails with Powell and its various defense counsel as part of a fraudulent scheme to play the float and reduce limits and defense costs. Id. ¶ 37.

The complaint then sets forth a number of examples where Resolute, under NICO's direction, allegedly limited local defense counsel's ability to investigate claims, impaired Powell's defense of claims, and denied coverage of claims:

1. In July 2011, in the David Smith case, Resolute denied coverage despite representing earlier that coverage was available and despite evidence showing that the plaintiff had served on ships containing Powell valves during the period covered by the policies. Additionally, Resolute refused to pay local defense counsel's fees. Complaint ¶ 39.

4

2. In late 2011, Resolute refused to accept defense of the <u>James DeSalvo</u> case on the grounds that the plaintiff's date of first exposure was "in the late 1970's" despite evidence developed by local defense counsel that the plaintiff's exposure could have been as early as 1974.  Resolute refused to provide coverage for the claim on the same grounds.  Complaint ¶ 40.

3.  In July 2013, in the <u>Daniel Swain</u> case, local defense counsel reported to Resolute that the plaintiff's exposure to asbestos began in 1976, or in other words, within the time period covered by Powell's policies.  Resolute, however, claimed that the plaintiff's exposure date was in 1977.  Without notifying Powell, Resolute asked local counsel to confirm that date and counsel revised its conclusion as to the exposure date to 1978 - a point that was outside of Powell's coverage.  In September 2013, Powell reached a settlement agreement with the plaintiff and tendered the claim to Resolute for payment.  Resolute, however, denied the claim and required Powell to fund the settlement.  Complaint ¶¶ 41-42.

4. Despite long-standing practice to the contrary, beginning in October 2013, as a condition of settlement, Resolute began requiring claimants to execute an affidavit affirming that they had actually worked with Powell valves.  Powell claims that this change in procedure undermined standing agreements in principle with certain of plaintiffs' counsel.  Resolute continues to enforce this change in practice over Powell's objections.  Complaint ¶ 45.

5. In early 2014, Resolute ignored Powell's complaints about certain local defense counsel, ignored Powell's request to change local defense counsel and rejected Powell's recommendations for replacement defense counsel.  Instead, Resolute chose its own replacement counsel, delayed notifying Powell about the change in counsel, and, over Powell's objections, began transferring cases to the replacement counsel.  Complaint ¶¶ 46-47.

6. Resolute instructed counsel not to contact Powell even though it was representing Powell on cases.  For in example, in the <u>Tilghman Cole Perry, Jr.</u> case, Resolute instructed counsel not to contact Powell even though Powell was funding a portion of the defense costs.  Additionally, Resolute instructed counsel to withhold from Powell relevant information concerning costs and exposure dates.  Complaint ¶ 48.

7.  In February 2011, Powell requested Resolute to notify it concerning all case reports, coverage communications, and settlement discussions.  Soon after this request, however, Resolute extended settlement authority to local defense counsel in three cases without notifying Powell.  Complaint ¶ 51-52.  Resolute  continued this pattern throughout 2012 and into 2013.  Complaint ¶¶ 53-54.

8.  In March 2013, without notifying Powell, Resolute agreed to a settlement in the <u>Raymond Yarnell</u> case that required Powell to fund 30% of the settlement.  Complaint ¶ 55.

9. During 2014, Resolute settled or extended settlement authority to local defense counsel in at least seven cases without notifying Powell.  Complaint ¶¶ 56-57.

10. In September 2014, Resolute, without Powell's consent, instructed local defense counsel not to submit case reports to Powell in cases with demands below a certain value.  Complaint ¶ 58.

11. Resolute delayed funding settlements to which OneBeacon had already agreed.  This  in turned damaged Powell's and local defense counsel's credibility with plaintiffs' counsel, leading to higher settlement demands from plaintiffs in other cases.  Complaint ¶ 60.

12. Resolute failed to pay the invoices of local defense counsel.  Complaint ¶ 61.  In some of the cases, it appears that Resolute did not pay the invoices based on its contention that coverage was not available.  In other cases, Resolute failed to pay invoices even though it had approved and funded

the settlement.  Resolute refused to pay invoices from counsel for services provided without approval from Powell.  Id.

As indicated above, Powell alleges that NICO and Resolute combined to form a racketeering enterprise for the purpose of enriching NICO by depriving Powell of the value of its insurance policies.  Powell alleges that NICO and Resolute carried out this racketeering enterprise through predicate acts of wire fraud involving material misrepresentations and omissions.  Powell also alleges that NICO, Resolute, and OneBeacon have breached their duty to process its claims in good faith.  Powell further alleges that OneBeacon breached the various insurance agreements and that, by their conduct, NICO and Resolute tortiously interfered with Powell's insurance contracts.

In October 2014, Powell filed a complaint against OneBeacon, NICO and Resolute asserting the following claims.  Count I alleges that NICO and Resolute violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1962(c), by conducting the affairs of an enterprise through a pattern of racketeering activity.  Count II  is a state law claim alleging that OneBeacon, NICO, and Resolute breached their duty to handle Powell's insurance claims in good faith.  Count III is a state law claim alleging that OneBeacon breached the insurance policies.  Count IV is a state law claim alleging that NICO and Resolute tortiously interfered with Powell's insurance agreements with OneBeacon.

OneBeacon, NICO and Resolute have each filed motions to dismiss Powell's complaint, or in the alternative, to stay this case pending the resolution certain state court matters involving OneBeacon and Powell.  According to public records filed by the Defendants,[2] there is at least one

_____

[2]The Court may take judicial notice of public records.  New England Health Care Emp. Pension Fund v. Ernst & Young, LLP, 336 F.3d 495, 501 (6th Cir. 2003).

7

matter pending in state courts touching on some of the same matters as this lawsuit.[3] Therefore, Defendants argue, the Court should stay or dismiss the complaint based on abstention principles. Defendants also argue that Powell's complaint fails to state claims for relief and assert a number of different grounds to support dismissal of the complaint. The Court discusses these arguments in more detail below.

## II. Rule 12(b)(6) Standard of Review

A motion to dismiss for failure to state a claim operates to test the sufficiency of the complaint. The court must construe the complaint in the light most favorable to Plaintiff, and accept as true all well-pleaded factual allegations. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Roth

---

[3] The first state court matter is a declaratory judgment action between Powell and OneBeacon pending in the Ohio courts. In that case, which was filed in early 2012, Powell sought a declaration of its rights under six General Accident policies covering the period from 1955 to 1965. Specifically, the parties disputed the coverage limits of the policies, i.e., whether the stated policy limits were annual or term limits; the meaning of an "occurrence," i.e., whether an "occurrence" was each individual lawsuit filed against Powell or whether an "occurrence" was the singular decision to sell valves containing asbestos; and the manner in which payment of claims could be allocated among policies, i.e., whether Powell could direct payment of a claim to a single policy or whether OneBeacon could pro rate the claim against several policies. Doc. No. 22-1. In September 2013, on cross-motions for summary judgment, the trial court ruled in Powell's favor on the first two issues and held that there were material issues of fact which precluded summary judgment for either party on the proper method for allocating claims. Doc. No. 17-3. OneBeacon filed a notice of appeal from the trial court's judgment, but the Ohio Court of Appeals concluded that it lacked jurisdiction over the appeal because the trial court had not issued a final order. William Powell Co. v. OneBeacon Ins. Co., No. C–130681, 2014 WL 3359311 (Ohio Ct. App. July 14, 2014). The Supreme Court of Ohio recently denied further review of the appeal. William Powell Co. v. OneBeacon Ins. Co., 26 N.E.3d 824 (Ohio 2015). The case is now back before the trial court and scheduled for trial on March 22, 2016.

There was a second matter concerning regulatory proceedings before the Pennsylvania Insurance Commissioner concerning the acquisition of OneBeacon by Trebuchet U.S. Holdings, Inc. A review of the Insurance Commissioner's website, however, indicates that the Commissioner approved this transaction in December 2014. Consequently, any request to stay or abstain from jurisdiction in favor of these proceedings is moot.

Steel Products v. Sharon Steel Corp., 705 F.2d 134, 155 (6th Cir. 1983).  The court need not accept as true legal conclusions or unwarranted factual inferences.  Lewis v. ACB Business Servs., Inc., 135 F.3d 389, 405 (6th Cir. 1998).

The complaint, however, must contain more than labels, conclusions, and formulaic recitations of the elements of the claim.  Sensations, Inc. v. City of Grand Rapids, 526 F.3d 291, 295 (6th Cir. 2008) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  The factual allegations of the complaint must be sufficient to raise the right to relief above the speculative level. Id.  Nevertheless, the complaint is still only required to contain a short, plain statement of the claim indicating that the pleader is entitled to relief.  Id. (citing Erickson v. Pardus, 551 U.S. 89, 93 (2007)).  Specific facts are not necessary and the pleader is only required to give fair notice of the claim and the grounds upon which it rests.  Id.  To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal,  556 U.S. 662, 678 (2009) (internal quotation marks omitted).  Mere conclusions, however, are not entitled to the assumption of truth.  Id. at 678-89.  A claim is facially plausible if it contains content which allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  Id. at 678.  Plausibility is not the same as probability, but the complaint must plead more than a possibility that the defendant has acted unlawfully.  Id. If the complaint pleads conduct which is only consistent with the defendant's liability, it fails to state a plausible claim for relief.  Id.

III. Analysis

A. RICO

Count I of the complaint alleges that NICO and Resolute conducted the affairs of an enterprise through a pattern of racketeering activity in violation of RICO. Specifically, Powell alleges that NICO and Resolute committed predicate acts of wire fraud in violation of 18 U.S.C. § 1343 in depriving or attempting to deprive it of the value of its insurance policies. RICO prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "Any person injured in his business or property by reason of a violation of section 1962 . . . may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]" 18 U.S.C. § 1964(c). NICO and Resolute advance a number of reasons why the complaint fails to state a claim for a RICO violation. Their principal argument, however, is that the McCarran-Ferguson Act preempts Powell's RICO claim because it would interfere with state insurance laws. The Court agrees.

The McCarran-Ferguson Act embodies the concept of "reverse preemption" in the field of insurance in which a state law relating to insurance will preempt and take precedence over a conflicting federal law that does not itself relate to insurance. Riverview Health Inst. LLC v. Medical Mut. of Ohio, 601 F.3d 505, 513-14 (6th Cir. 2010). Specifically, the McCarran-Ferguson

10

Act provides:

> (a) State regulation
>
> The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
>
> (b) Federal regulation
>
> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance[.]

15 U.S.C. § 1012.

Determining whether the McCarran-Ferguson Act reverse preempts a federal statute is a three-step process. First, the court must determine whether the federal statute at issue relates specifically to the business of insurance. If it does, then the McCarran -Ferguson Act does not apply and the federal statute will not be reverse preempted. Riverview Health, 601 F.3d at 514. Second, the court must determine whether the state law at issue was enacted for the purpose of regulating the business of insurance. Id. If the state law was not enacted for the purpose of regulating the business of insurance, then reverse preemption does not apply. Id. Third, the court must determine whether application of the federal statute would invalidate, supersede or impair the state statute. Id. If application of the federal statute would not invalidate, supersede or impair the state statute, then reverse preemption does not apply. Id. Accordingly, in order for the McCarran-Ferguson Act to reverse preempt a federal statute, the answer to the first question must be "no" and the answers to the second and third questions must each be "yes." See id.

In support of its reverse preemption argument, NICO and Resolute point out that: 1) RICO does not specifically relate to the business of insurance; 2) Ohio has enacted a complex statutory and administrative scheme to regulate unfair insurance practices, including unfair claims handling; and

3) because Ohio does not provide a private cause of action to insureds for unfair insurance practices, a statute like RICO, which permits recovery of treble damages against the defendant in the event of a violation, would  invalidate, impair or supersede Ohio's ability to regulate the business of insurance.

In response, Powell recognizes that RICO does not specifically relate to the business of insurance.  See Riverview Health, 601 F.3d at 514; Kenty v. Bank One, Columbus, N.A., 92 F.3d 384, 391 (6th Cir. 1996).  Moreover, Powell concedes that the statutes and regulations cited by NICO and Resolute relate to the business of insurance.  Doc. No. 28, at 33.  Powell argues, however, that allowing its RICO claim to proceed against NICO and Resolute would not invalidate, impair or supersede Ohio's insurance regulatory regime because its claim does not conflict with Ohio statutes and regulations.

In determining whether enforcing RICO will invalidate, impair or supersede the state statute, the trial court should consider: (1) the availability of a private right of action under the state insurance scheme; (2) the availability of a state common law remedy; (3) the possibility that other state statutes provide the basis for suit; (4) the availability of punitive damages; (5) whether the damages available under the state insurance scheme could exceed the damages recoverable under RICO, even taking into account RICO's treble damages provision; (6) the absence of a position by the State regarding any interest in state policy or the administrative scheme; and (7) the fact that insurers have relied on RICO to eliminate insurance fraud.  Riverview Health, 601 F.3d at 517.  In this case, analysis of these factors leads to the conclusion that allowing Powell to proceed with its RICO claim against NICO and Resolute will invalidate, impede or supersede the Ohio's statutory

and administrative scheme for regulating insurance.  Consequently, Powell's RICO claim is reverse preempted by state law pursuant to the McCarran-Ferguson Act.

First, Ohio does not provide a private right of action, under either a statute or the common law, for insureds to sue third-party claims administrators for alleged unfair or deceptive claims handling.  Both the Ohio Revised Code and the Ohio Administrative Code set forth comprehensive provisions concerning unfair insurance practices and unfair claims handling practices.  Ohio Rev. Code § 3901.21, Ohio Admin. Code §§ 3901-01-07, 3901-01-54.  Ohio law, however, does not provide a private cause of action to insureds against insurance companies or their claims administrators for committing unfair insurance practices.  Strack v. Westfield Co., 515 N.E.2d 1005, 1006-08 (Ohio Ct. App. 1986).

Similarly, while an insured may sue his insurer for processing his claim in bad faith, Zoppo v. Homestead Ins. Co., 644 N.E.2d 397, 399 (Ohio 1994), Ohio has not extended this claim to third-party claims administrators like NICO and Resolute.  Ohio courts, rather, have specifically noted that a bad faith claim arises out of the contractual relationship between the insurer and the insured and have consistently rejected bad faith claims where the parties are not in privity with each other. Gillette v. Estate of Gillette, 837 N.E.2d 1283, 1286-87 (Ohio Ct. App 2005)(collecting cases); see also Eastham v. Nationwide Mut. Ins. Co., 586 N.E.2d 1131, 1133 (Ohio Ct. App. 1990) ("[W]e believe that liability for bad faith must be strictly tied to the implied-in-law covenant of good faith and fair dealing arising out of the underlying contractual relationship.") (emphasis added).  Relying on Judge Marbley's opinion in Eves v. AIG, Inc., No. 2:09–cv–00543, 2010 WL 749925 (S.D.Ohio Feb. 22, 2010), Powell suggests elsewhere in its brief that "an insured may pursue a bad faith claim

against an entity that manages the insurance policy, even where the insured can not establish privity of contract with that entity." Id. at *3.

The Court respectfully finds that Judge Marbley's opinion in Eves is not persuasive authority that Ohio would recognize an insured's bad faith claim against a third-party claims administrator. In his opinion, Judge Marbley noted that no Ohio court had ever addressed this issue. Judge Marbley, nevertheless, specifically relied on dicta from Dombroski v. WellPoint Inc., 879 N.E.2d 225, 235–38 (Ohio App. Ct. 2007), to find that such a claim exists based on the theory that the duty of good faith extends to the third-party claims administrator because it has assumed the duties of the insurance company. Eves, 2010 WL 749925, at *3. Dicta from lower appellate courts, however, generally is not a firm indication as to how the highest state court would rule on an unsettled question of state law. See Orchard Group, Inc. v. Konica Medical Corp., 135 F.3d 421, 427 (6th Cir. 1998) (when deciding an unsettled question of state law the district court may consider, inter alia, state supreme court dicta). Moreover, at the time of Judge Marbley's opinion, the Supreme Court of Ohio had already reversed Dombroski, making that court's dicta an even more untenable basis upon which to extend a duty of good faith to a claims administrator not in privity with the insured. See Dombroski v. WellPoint, Inc., 895 N.E.2d 538 (Ohio 2005). As indicated by Gillette, supra, and the cases cited therein, the Court finds that Ohio law most strongly points to the conclusion that, absent privity, an insured may not sue a third-party claims administrator for adjusting its claim in bad faith. See Riverview Health, 601 F.3d at 518. The absence of a state law claim indicates that allowing Powell's RICO cause of action to proceed would impair or impede state insurance law.

Second, the conclusion that a state law claim is not available to Powell for the alleged unfair or deceptive manner in which NICO and Resolute handled its asbestos claims is more or less

14

conclusive of the next several factors.  No other state statute would provide a basis for a state suit against NICO and Resolute to redress the alleged wrongful claims handling practices, nor has Powell identified an alternative statute.  Since state law does not provide any cause of action, state awards of punitive damages are not available to Powell.  For the same reason, an award of treble damages under RICO would exceed the damages available to Powell under state law, which, as stated, would be none.  These factors all indicate that RICO would impair, invalidate or supersede Ohio's insurance regulatory scheme.  See Riverview Health, 601 F.3d at 518.  Indeed, many aspects of Powell's complaint touch on areas specifically regulated by Ohio statutes and regulations.[4]  Powell's ability to recover damages under RICO for violations of these regulations when Ohio does not make private relief available would result in the invalidation or impairment of Ohio's regulatory scheme.

Third, as indicated by NICO and Resolute, the State of Ohio has taken the position that a RICO claim to redress alleged unfair and deceptive claims handling practices would upset and impair its regulatory scheme and impede its ability to detect insurance fraud.  Doc. No. 22-3; Riverview Health, 601 F.3d at 518-19.  As indicated by the State, insurers would be reluctant to delay or stop paying suspected fraudulent insurance claims for fear of being sued by the insured for a RICO violation.  See Doc. No. 22-3, at 17-19.

---

[4]For instance, Powell's core allegation, that NICO and Resolute paid out claims according to a set formula in order to boost NICO's profits (complaint ¶¶ 27, 31) would apparently fall within Ohio Rev. Code § 3901.21(P), which makes it illegal for an insurer to "use[], or permit[] to be used, a pattern settlement as the basis of any offer of settlement."  Other insurance regulations cover misrepresenting or withholding pertinent information from the insured, misrepresenting coverage terms,  failing to adopt reasonable investigation procedures, failing to inform the insured about settlements, failing to make reasonable settlement offers, and failing to timely pay settlements.  See Ohio Admin. Code §§ 3901-01-7(C)(1), (4), (6), (12), (13), (15) & (16).  Powell's RICO claim encompasses all of these regulations.

Fourth and finally, there is no suggestion in the record that insurance companies in Ohio rely on federal RICO to combat insurance fraud.   The idea behind this factor seems to be that if an insurance company can use RICO to address insurance fraud, then the state's insurance regulatory scheme would not be impaired by an insured bringing a RICO claim against an insurance company. See Humana Inc. v. Forsyth, 525 U.S. 299, 314 (1999) (noting that insurance companies have relied on RICO when they were the fraud victims); Weiss v. First Unum Life Ins. Co., 482 F.3d 254, 267-68 (3rd Cir. 2007)("We find that depriving all players in the New Jersey insurance scheme of the right to sue under RICO is not part of the state's declared insurance policy, and we cannot simply presume such an atypical legislative aim from the structure of New Jersey's insurance laws.").  In this case, however, at least according to the State of Ohio's amicus brief in Riverview Health, insurance companies are expected and more or less required to work cooperatively with the Ohio Department of Insurance to investigate and eliminate insurance fraud.   Moreover, although admittedly not a comprehensive survey, the Court's search of Westlaw did not find a case in which an Ohio insurer used federal RICO to sue an insured for insurance fraud.  Compare to  American Mfrs. Mut. Ins. Co. v. Townson, 912 F. Supp. 291 (E.D.Tenn. 1995)(insurance company sued insureds for fraud and for violation of RICO)(Tennessee).  This factor, therefore, also supports finding that Powell's RICO claim against NICO and Resolute is reverse preempted by state law.

In short, this case is materially indistinguishable from Riverview Health, in which the Court concluded that the plaintiff's RICO claim against the insurance company was reversed preempted by the McCarran-Ferguson Act because RICO would impair Ohio's scheme for regulating insurance.  Here, all of the factors discussed above strongly indicate that Powell's RICO claim would impair, invalidate or supersede state insurance law.  Therefore,  Powell's RICO claim is reverse preempted

16

by the McCarran-Ferguson Act.  Accordingly, NICO and Resolute are entitled to dismissal of Powell's RICO claim against them.

### B. Bad Faith

Powell claims that NICO and Resolute handled its insurance claims in bad faith.  As just discussed, however, Ohio does not provide a claim for based on the bad faith handling of insurance claims where the parties are not in privity with each other.  In this case, the complaint indicates that Powell is in privity with OneBeacon, but not with NICO or Resolute.  Complaint ¶ 21 (NICO assumed claims handling responsibilities from OneBeacon); Complaint ¶ 22 (NICO delegated claims handling responsibilities to Resolute); Complaint ¶ 25 ("NICO has no contractual relationship with Powell.")  Therefore, Powell does not have a bad faith cause of action against either NICO or Resolute.

Accordingly, NICO and Resolute are entitled to dismissal of Powell's bad faith claim.

### C. Tortious Interference with Contract

Finally, Powell alleges that by their actions in denying coverage of claims, impairing its ability to defend against claims, and failing to pay settlements and costs, NICO and Resolute caused OneBeacon to breach its obligations under the various insurance policies and thereby tortiously interfered with its insurance contracts with OneBeacon.  Tortious interference with contract occurs when the defendant intentionally and improperly causes or induces a third person not to perform his obligations to the plaintiff under the contract.  Fred Siegel Co., L.P.A. v. Arter & Hadden, 707 N.E.2d 853, 858 (Ohio 1999)(citing RESTATEMENT (SECOND) OF TORTS § 766 (1979)). The elements of a tortious interference with contract claim are: 1) the existence of a contract, 2) the wrongdoer's

knowledge of the contract, 3) the wrongdoer's intentional procurement of the contract's breach, 4) the lack of justification, and 5) resulting damages.  Id.

NICO and Resolute argue that, as OneBeacon's claims agents, they were not "outsiders" to the insurance contracts.  They contend that under Ohio law, when acting within the scope of his authority, a principal's agent cannot be held liable for tortiously interfering with the principal's contract.  Moreover, NICO and Resolute point out, all of the  alleged wrongful acts about which Powell complains fall squarely within the administrative duties assigned to them by OneBeacon.

An agent can be liable for tortiously interfering with the principal's contract only if he acted and benefitted from the alleged interference solely in his individual capacity.  Miller v. Wikel Mfg. Co., Inc., 545 N.E.2d 76, 79 (Ohio 1989) (president of company not liable for tortious inference with contract where his activities did not "benefit[] him solely in a personal capacity"); Boyd v. Archdiocese of Cincinnati, No. 25950, 2015 WL 1600303, at *8 (Ohio Ct. App. Apr. 10, 2015).  As NICO and Resolute accurately argue, NICO's service agreement with OneBeacon provided the claims administrator with broad discretionary authority to administrate and settle claims on OneBeacon's behalf.  Consequently, the acts forming the basis of Powell's tortious interference claim - denying coverage, failing to communicate with Powell, failing to defend claims appropriately, and failing to pay settlements and defense costs - are within the scope of the responsibilities OneBeacon assigned to NICO and Resolute.[5]  See, e.g., Theobald v. University of

---

[5]Among other provisions, the administrative services agreement states that the claims administrator may "adjust, handle, agree, settle, pay, compromise, or repudiate any claims," that it may "fund the obligations of any third party in connection with any claim or any other manner," that it may "enter into any arrangement which the Administrator considers will or may avoid or reduce liability," and that it may "instruct lawyers, claims adjusters or other consultants or experts[.]" Doc. No. 22-2, at 7-8.

18

Cincinnati, 857 N.E.2d 573, 577 (Ohio 2006)(stating that the concept of "'scope of employment'. . . generally denotes an agency relationship in which the agent or employee is engaged in an activity that is logically related to the business of the principal or employer"); Finley v. Schuett, 455 N.E.2d 1324, 1325 (Ohio Ct. App. 1982)("Where an act has no relation to the conduct of the master's business, it may not be argued that the servant was acting upon the scope of his authority."). Therefore, the facts alleged in the complaint show that NICO's and Resolute's alleged interference with Powell's insurance agreements was not solely for their benefit because these acts were logically related to the business of OneBeacon.

Since the complaint indicates that NICO and Resolute's alleged wrongful acts were within the scope of their agency with OneBeacon, it is immaterial, in the Court's opinion, that Powell also alleges that they allegedly were motivated solely by their own self-interest to cause OneBeacon to breach the insurance agreements.  See, e.g. RESTATEMENT (SECOND) OF AGENCY § 228(1)(c) ("Conduct of a servant is within the scope of employment if . . . it is actuated, at least in part, by a purpose to serve the master[.]")(emphasis added).  Moreover, it is not reasonable to infer that NICO and Resolute, by actually settling and paying some, if not many, of the claims presented under the insurance polices, acted "solely" on their own behalves and not in furtherance of OneBeacon's business.  HDC, LLC v. City of Ann Arbor, 675 F.3d 608, 611 (6th Cir. 2012) (under Rule 12(b)(6), the plaintiff must plead facts that permit the court to draw reasonable inferences); see, e.g. Complaint ¶ 50 (alleging that Resolute unilaterally approved settlements); id. ¶ 52 (alleging that Resolute approved local defense counsel's request for settlement authority); id. ¶ 54 (alleging that Resolute granted settlement authority to local defense counsel); id. ¶ 56 (same); id. ¶ 57 (alleging

that Resolute increased settlement authority); id. ¶ 61 (alleging that in some cases Resolute paid

100% of settlement costs but allegedly refused to pay costs of defense).

Accordingly, NICO and Resolute are entitled to dismissal of Powell's tortious interference

with contract claim.

**IT IS SO ORDERED**


Date: <u>September 30, 2015</u>                         <u>S/Susan J. Dlott           </u>
                                                        Judge Susan J. Dlott
                                                        United States District Court