# EXHIBIT J

CIN-TEL CORPORATION

PH:  513-621-7723                                                FX:  513-263-9023

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

_____

| | |
|---|---|
| THE WILLIAM POWELL COMPANY, | : |
| Plaintiff, | : |
| vs. | : CASE NO.: |
| NATIONAL INDEMNITY COMPANY, et al., | : 1:14-CV-00807 |
| Defendants. | : |

_____

TELEPHONIC DEPOSITION OF:  CLAYTON BUDLONG

December 8, 2016

10:02 a.m.

REPORTED BY:

Renee Rogers, Registered Professional Reporter

CIN-TEL CORPORATION

PH: 513-621-7723                                        FX: 513-263-9023

---

Page 2

```
 1        UNITED STATES DISTRICT COURT
 2          SOUTHERN DISTRICT OF OHIO
 3              WESTERN DIVISION
 4              _____
 5   THE WILLIAM POWELL COMPANY,       :
 6            Plaintiff,               :
 7   vs.                  : CASE NO.:
 8   NATIONAL INDEMNITY COMPANY, et al.,  : 1:14-CV-00807
 9            Defendants.              :
10              _____
11
12       Telephonic deposition of CLAYTON BUDLONG, a
13   witness herein, taken by the Plaintiff as upon
14   cross-examination pursuant to notice and stipulations
15   hereinafter set forth, at the offices of Vorys, Sater,
16   Seymour and Pease, LLP, 301 East Fourth Street, Suite
17   3500, Cincinnati, Ohio, at 10:02 a.m. on Thursday,
18   December 8, 2016, before Renee Rogers, Registered
19   Professional Reporter and notary public within and for
20   the state of Ohio.
21              _____
22            Cin-Tel Corporation
            810 Sycamore Street, Suite 103
23           Cincinnati, Ohio  45202
                (513) 621-7723
24
```

---

Page 3

```
 1   APPEARANCES:
 2   On behalf of the Plaintiff:
 3   KATHERINE G. BARNES, ESQ.
     DAVID F. HINE, ESQ.
 4   JOSEPH M. BRUNNER, ESQ.
     Vorys, Sater, Seymour and Pease, LLP
 5   3500 Great American Tower
     301 East Fourth Street
 6   Cincinnati, Ohio  45202
     (513) 723-4000
 7   kgbarnes@vorys.com
     dfhine@vorys.com
 8   jmbrunner@vorys.com
 9
     On behalf of Defendant OneBeacon Insurance Company (by
10   telephone):
11   RICHARD M. GARNER, ESQ.
     Collins, Roche, Utley & Garner, LLC
12   655 Metro Place South, Suite 200
     Dublin, Ohio  43017
13   (614) 901-9600
     rgarner@cruglaw.com
14
```

---

Page 4

```
 1              S T I P U L A T I O N S
 2
 3       It is stipulated by and among counsel for the
 4   respective parties that the telephonic deposition of
 5   Clayton Budlong may be taken at this time by the
 6   Plaintiff as upon cross-examination pursuant to the
 7   Federal Rules of Civil Procedure and pursuant to
 8   Notice and agreement of counsel as to the time and
 9   place; that the deposition may be taken in stenotype
10   by the notary public-court reporter and transcribed by
11   her out of the presence of the witness; that the
12   deposition is to be submitted to the deponent for his
13   examination and signature, and that the signature may
14   be affixed outside the presence of the notary
15   public-court reporter.
```

---

Page 5

```
 1              I N D E X
 2   Witness
 3   CLAYTON BUDLONG                              Page
 4     Cross by Ms. Barnes                          9
 5
 6              E X H I B I T S
 7
 8       (No exhibits were marked.)
```

---

CIN-TEL CORPORATION

PH: 513-621-7723 FX: 513-263-9023

Page 6

1       MS. BARNES: Mr. Budlong, my name is
2  Katie Barnes, and I am here to ask you
3  some questions.
4       Before we begin, can everyone just
5  identify themselves for the record.
6  Once again, I'm Katherine, or Katie,
7  Barnes.
8       MR. GARNER: My name is Richard
9  Garner, and I represent OneBeacon
10 Insurance Company.
11      THE WITNESS: My name is Clayton
12 Budlong, and I'm a team leader at
13 Resolute Management.
14      MS. BARNES: Thank you. And I
15 failed to mention that I represent The
16 William Powell Company.
17      Mr. Budlong, where are you right
18 now?
19      THE WITNESS: In Boston,
20 Massachusetts.
21      MS. BARNES: Are you in your office?
22      THE WITNESS: Yes, I am.
23      MS. BARNES: Okay. Can I just
24 please ask that you refrain from looking

Page 7

1  at anything during this deposition, you
2  know, not your computer or any document,
3  and if for some reason you do refer to
4  something, will you please let me know?
5       THE WITNESS: Yes.
6       MS. BARNES: And I also want to make
7  clear that the court reporter cannot
8  swear you over the phone, but Rich has
9  agreed that, you know, this testimony
10 will be considered under oath.
11      So do you understand that this
12 testimony is going to be under oath and
13 you need to tell the truth?
14      THE WITNESS: Yes.
15      MS. BARNES: Great. Have you ever
16 been deposed before?
17      THE WITNESS: Yes.
18      MS. BARNES: In your capacity as an
19 employee for Resolute, or in another
20 capacity?
21      THE WITNESS: Both in my capacity --
22 in my employment at Resolute as well as
23 in another capacity.
24      MS. BARNES: Okay. So you

Page 8

1  understand that I'm going to ask you
2  some questions, and if any of my
3  questions are unclear, please let me
4  know, and I'll work with you to ask a
5  question that you do understand.
6       THE WITNESS: Okay.
7       MS. BARNES: And because of the
8  telephone, it's especially important
9  that you give a verbal response, and
10 preferably a "yes" or a "no" as opposed
11 to a "yeah" or a "nah." Those are more
12 difficult for the court reporter to pick
13 up.
14      THE WITNESS: Okay.
15      MS. BARNES: And can you hear me
16 clearly right now?
17      THE WITNESS: Yes.
18      MS. BARNES: Okay. Great. I'm
19 going to try very hard not to speak over
20 you, and if you would do the same and
21 try not to speak over me, because,
22 again, that's hard for the court
23 reporter to take down.
24      THE WITNESS: Okay.

Page 9

1            CLAYTON BUDLONG,
2  having acknowledged that his testimony will be
3  given as if under oath, was examined and testified
4  as follows:
5            CROSS-EXAMINATION
6  BY MS. BARNES:
7       Q  Did you do anything to prepare for
8  this deposition?
9       A  The only thing I did to prepare was
10 meet with Mr. Garner prior to -- yesterday.
11      Q  And how long did you guys meet for?
12      A  Probably about 45 minutes or so, 45
13 minutes to an hour total.
14      Q  Okay. And I don't want to know
15 about the substance of those discussions, but did
16 you review any documents before, you know, today
17 in preparation for this deposition?
18      A  The only thing that I reviewed was
19 my affidavit.
20      Q  Okay. Great. So you did execute an
21 affidavit in this case or a declaration; is that
22 correct?
23      A  That's correct.
24      Q  Did you draft that affidavit?

3 (Pages 6 to 9)

WWW.CINTELCORPORATION.COM       E-Mail   CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH: 513-621-7723               FX: 513-263-9023

Page 10

```
 1       A  Yes.
 2       Q  Okay. Did you have any assistance
 3   in drafting that affidavit?
 4       A  Well, I believe, if I recall -- I
 5   have to be honest. I don't recall exactly, but I
 6   know that it was -- that it was -- I worked with
 7   counsel to draft it.
 8       Q  Okay. Did you review any documents
 9   or anything in order to provide information to
10   counsel for that affidavit?
11       A  No. I did it by memory.
12       Q  Did you review the affidavit before
13   you signed it?
14       A  Yes.
15       Q  And do you believe it was accurate
16   when you signed it?
17       A  Yes.
18       Q  You mentioned that your current role
19   at Resolute is a team leader?
20       A  That's correct.
21       Q  And do you currently have any
22   involvement with The William Powell Company or The
23   William Powell Company's accounts?
24       A  No.
```

Page 11

```
 1       Q  Did you previously?
 2       A  Yes.
 3       Q  And in what role?
 4       A  As a team leader.
 5       Q  And what's the time frame for that?
 6       A  2010 to 2014.
 7       Q  And so unless I specifically state,
 8   all of my questions are going to relate to that
 9   2010-2014 time frame in which you were a team
10   leader involved in the William Powell accounts.
11       A  Okay.
12       Q  So in your role as team leader over
13   the William Powell accounts, what did you do?
14       A  I worked as a manager for Darilyn
15   Michaud, who was the account manager assigned to
16   the William Powell account.
17       Q  Did you work with anyone else in
18   that role?
19       A  Yes, I would. At different times
20   during the 2010 to 2014 time frame, I worked with
21   either Chris Dardis and/or Peter Dinunzio as --
22   with respect to asbestos claims evaluations.
23       Q  Okay. Do you remember what Chris
24   Dardis's role was at that time, or job title was?
```

Page 12

```
 1       A  His job title at that time was team
 2   leader.
 3       Q  What about Peter Dinunzio?
 4       A  I'm not sure what his job title
 5   was. He headed up the Asbestos Strategic Unit.
 6       Q  Okay. To whom did you report?
 7       A  From 2010 until 2013 I reported to
 8   Brooke Green. From 2013 to 2014 I reported to
 9   David Gold.
10       Q  Okay. Is Brooke Green still at
11   Resolute?
12       A  Yes.
13       Q  Why did you stop working with
14   William Powell accounts?
15       A  Darilyn was transferred off of my
16   team to a different team.
17       Q  Do you know why?
18       A  It was just a reorganization move.
19   We brought in a new team leader to replace an old
20   team leader, and we -- I don't -- I don't totally
21   recall exactly the machinations of it, why we
22   swapped account managers.
23           However, it was done in that context
24   as when Greg came in, I think -- and I don't even
```

Page 13

```
 1   recall the individuals involved, other than a
 2   couple of my folks went to him and a couple of his
 3   folks went to me.
 4       Q  Okay. Got it. So during that 2010
 5   to 2014 time frame that you worked with Powell,
 6   did you handle any specific asbestos claims?
 7       A  I don't understand the question.
 8       Q  Did you have any authority or
 9   responsibility for specific claims made against
10   Powell?
11       A  Yes.
12       Q  Can you tell me what those were.
13       A  From 2010 to 2013, as a team leader,
14   I had personal authority up to $50,000 to review
15   Darilyn's submissions in excess of her personal
16   authority up to a maximum of my 50,000 authority
17   to approve settlement authority requests.
18       Q  Okay. So when you say you had
19   personal authority up to 50,000, you mean
20   settlement authority?
21       A  That's correct.
22       Q  And if there was a request for a
23   settlement above 50,000, what happened then?
24       A  From 2010 to 2013, that request
```

WWW.CINTELCORPORATION.COM                 E-Mail   CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH: 513-621-7723    FX: 513-263-9023

Page 14

1  would go to Chris Dardis.
2       Q  And then what about 2013 to 2014?
3       A  As of 2013 we reorganized and
4  established the Asbestos Strategic Unit, and as
5  part of that reorganization, a decision was made
6  that the team leaders would have no personal
7  authority.
8            The account managers would retain
9  their personal authority, and thereafter, anything
10 above the personal authority of the account
11 managers would be submitted to the team leaders
12 for review, and then passed on to the Asbestos
13 Strategic Unit for ultimate authority.
14      Q  Do you know why that change was made
15 internally?
16      A  I would -- my understanding is that
17 we felt it was a more effective way to administer
18 asbestos bodily injury claims.
19      Q  And that authority applied to all
20 accounts, not just the Powell account?
21      A  That's correct.
22      Q  In your role from 2010 to 2014, what
23 other duties or responsibilities did you have with
24 respect to the William Powell account other than,

Page 15

1  you know, settlement authority up to $50,000?
2       A  Nothing, other than that that was
3  attendant to the settlement authority, meaning
4  reviewing the submissions to make sure there was
5  sufficient information to evaluate, and then
6  evaluating that.  That would be the extent.
7       Q  Okay.  Did you formulate any
8  policies or procedures generally?
9       A  Can you -- can you restate that,
10 restate that question?
11      Q  Sure.  Were you responsible for
12 creating or implementing any policies or
13 procedures with respect to the administration of
14 accounts that fell within your purview?
15      A  It was my responsibility as a team
16 leader to ensure that the accounts were handled in
17 a timely fashion.  So other than general good
18 claims practice, meaning timely handling, timely
19 review, timely responsiveness to the insureds, and
20 overall handling of asbestos claims, that would be
21 the extent of my involvement in establishing or
22 monitoring any policies with respect to asbestos
23 claims.
24      Q  Okay.  So in your declaration in

Page 16

1  paragraph three, you say:  I was involved in
2  setting general policies about the handling of the
3  William Powell account.  That's what you meant?
4       A  Yeah.  I would really -- in that
5  circumstance, I looked at that statement as you
6  could interchange William Powell account with
7  asbestos account.
8            And so I looked at that -- because
9  the question was did you -- you know, did you set
10 policies for the William Powell account.  I looked
11 at it -- and it's not really setting policies, but
12 it's administering the policies of handling
13 asbestos claims, and that's why I felt it was
14 accurate to say that.
15      Q  Okay.  What sort of written
16 documents did you see as part of your role as team
17 leader over the William Powell account?
18      A  E-mails and asbestos requests for
19 settlement authority.
20      Q  Would those have --
21      A  And --
22      Q  I'm sorry.
23      A  And any other attendant documents
24 that may have been provided by defense counsel;

Page 17

1  possibly medical reports, possibly any -- any
2  additional attachments that they may have attached
3  to the asbestos requests for settlement authority.
4       Q  Did the asbestos requests for
5  settlement authority typically come to you in hard
6  copy, or via e-mail, or how did you get those?
7       A  Via e-mail.
8       Q  Did you see any sort of exposure
9  modeling?
10      A  Yes.  I may have.  I don't
11 independently recall.  But we do do exposure
12 modeling here, and so I -- it would not surprise
13 me to -- yeah, if I saw modeling in the context of
14 the William Powell account.  I just don't have any
15 independent recollection of it.
16      Q  And how would that exposure modeling
17 have come to you?
18      A  Through e-mail.
19      Q  Would Darilyn have been on those
20 e-mails, or is that something that as a team
21 leader you were privy to and she was not?
22      A  No.  Typically it would -- it would
23 quite possibly have come from Darilyn.  I don't
24 recall whether she -- I don't believe Darilyn did

WWW.CINTELCORPORATION.COM            E-Mail    CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH: 513-621-7723                                          FX: 513-263-9023

Page 18

1  do the modeling.  And that's why I'm -- meaning I
2  don't think she used those modeling calculators.
3  And so that's why I'm not even positive that I
4  would have seen it on the William Powell account.
5          I'm just stating that because I
6  certainly would see it on a -- on a -- you know,
7  any number of other asbestos accounts, and I hate
8  to say it, but I may be just assuming that I saw
9  it on the William Powell account.
10      Q   Why would modeling occur on one
11 account but not on another account?
12      A   When I say that, I mean that -- I do
13 not mean that the modeling --
14          MR. GARNER:  Hold on.  Wait.  I'm
15      sorry.  I was on mute there, because I
16      didn't want to -- I want to object,
17      Katie.
18          MS. BARNES:  On what basis?
19          MR. GARNER:  On the basis of
20      privilege.  On the basis of privilege,
21      because now we're talking about other
22      accounts.
23          If you want to talk about the
24      William Powell account, that's fine, but

Page 19

1      we cannot get into other accounts and
2      how other accounts may be handled.
3          MS. BARNES:  I don't -- I would -- I
4      don't think that's privileged.  I guess
5      you could make a relevancy argument, but
6      I don't think that information is
7      privileged.
8          MR. GARNER:  It's absolutely
9      privileged.  We're talking about ongoing
10     claims for other clients of which
11     William Powell has no right to see that
12     information.
13         MS. BARNES:  I'll restate my
14     question and try and take care of your
15     concern.
16         MR. GARNER:  Okay.  Sorry, Clayton.
17     I was on mute there.  I couldn't get on
18     quick enough.
19      Q   Mr. Budlong, was there any sort of
20 policy or procedure that Resolute had in place
21 that spoke to when or if an exposure modeling
22 should occur on an account?
23         MR. GARNER:  Again, I'm going to
24     object to the extent it's not dealing

Page 20

1      with William Powell.  These are very
2      limited depositions dealing simply with
3      documentary discovery issues.
4          I don't want to step in your way,
5      but I think, generally speaking, that
6      kind of question may be objectionable.
7          If you can answer it, Clayton,
8      without going into details about what
9      you're doing on other accounts, go
10     ahead; but otherwise, I'm going to
11     instruct you not to answer it as
12     privileged.
13      A   Could you repeat the question.
14      Q   Sure.  Did Resolute have a general
15 policy or procedure stating that exposure modeling
16 should occur on every account?
17      A   Not that I'm aware of.
18      Q   And I apologize if this is going
19 back, but -- so your testimony is you're not sure
20 if this exposure modeling occurred on the William
21 Powell account or not?
22      A   No.  My testimony is I'm not sure
23 that I saw it in e-mail format or that I saw a
24 copy of it.

Page 21

1      Q   But your understanding is that it
2  would have occurred at some point?
3       A   Yes.
4       Q   Okay.  Are there any other written
5  documents that you can think of other than those
6  that you've previously testified to that you would
7  have seen or reviewed in your role as team leader
8  over the William Powell account?
9       A   Not that I can think of.
10      Q   Did you have a physical file
11 concerning Powell?
12      A   No.
13      Q   You never had a physical file for
14 Powell?
15      A   No.
16      Q   The documents that you testified you
17 reviewed, you testified -- did those typically
18 come to you in e-mail or electronic format, or did
19 you receive them in hard copy through some sort
20 of, like, interoffice mail?
21      A   E-mail.
22      Q   Okay.  All of them would have been
23 through e-mail?
24      A   Yes.

WWW.CINTELCORPORATION.COM                E-Mail   CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH: 513-621-7723                                    FX: 513-263-9023

Page 22

1   Q  Okay.  Did you have access to a
2   shared network space concerning Powell?
3   A  I have access to a shared network
4   space.  I don't independently know that there were
5   Powell documents on it, but that could be the
6   case.
7   Q  Does your shared network, does it
8   have a name, or what do you call that?
9   A  Our shared network is the V drive.
10  Q  And who all would have access to
11  Powell's V drive or the V drive for Powell?
12  A  You know, I don't -- I don't think I
13  can answer that.  I don't know that answer.
14  Q  Did you ever save documents in the V
15  drive for Powell?
16  A  No.
17  Q  What sort of documents would have
18  been shared in that space?
19  A  Any and all documents of all
20  nature.  I don't -- as I said, I'm not even sure
21  that there's anything in the V drive for Powell.
22  It's just a space to save documents in folderized
23  fashion.
24  Q  Did you ever look in the V drive for

Page 23

1   Powell?
2   A  No.  Not that I -- not that I can
3   recall.
4   Q  Okay.  Did you ever save documents
5   onto your desktop or laptop's hard drive
6   concerning Powell?
7   A  Not that I can recall.
8   Q  So, before I was speaking more
9   generally about just any written document.  Now
10  I'm going to focus on communications or
11  correspondence regarding Powell.
12      How did you typically correspond
13  with other people about the William Powell
14  account?
15  A  Through e-mail.
16  Q  Would you ever have sent a note or a
17  -- like a handwritten note or a letter to anyone?
18  A  I don't recall.  And I would not
19  think so.  Essentially, I would, you know,
20  administer the account through my e-mail.  And to
21  the extent that I would save anything, it would
22  just be put into an e-mail folder.
23  Q  Okay.  Did you have any sort of,
24  like, instant messaging, you know, type system at

Page 24

1   Resolute, or do you have any sort of instant
2   messaging system?
3   A  No.
4   Q  Okay.  Did you have any meeting
5   agendas that you would have saved?
6   A  Not that I can recall.
7   Q  Do you recall ever attending a
8   meeting about the William Powell account?
9   A  It's quite possible we would have
10  meetings with respect to individual plaintiff
11  cases to discuss valuation issues, and other than
12  that, that would be the only meeting I would think
13  we would have had.
14  Q  Who would have been at those
15  meetings?
16  A  Depending on the time frame, it
17  would either be Darilyn, myself, and Peter
18  Dinunzio, or Darilyn, myself, and Chris Dardis.
19  Q  Okay.  Did you save e-mails
20  regarding the Powell account?
21  A  Just to the extent, as I've already
22  testified, that I put them in folders.  And to the
23  extent that those folders are, you know, still
24  there, I'm assuming that they're still there.

Page 25

1   Q  Where would the folders have been?
2   A  On my Outlook.
3   Q  So you would have created like an
4   individual folder in your in-box for every -- or
5   for the Powell account?
6   A  That's correct.
7   Q  Okay.  Do you still have that folder
8   on your Outlook?
9   A  I'm not sure.  I'm assuming I do,
10  unless it's -- I don't know.  I don't know what
11  the system has as far as automatic -- I don't
12  think it automatically deletes, or whether it goes
13  into, you know, some sort of long-term storage or
14  whatever, but I didn't delete it, so it should
15  still be there.
16  Q  And you're not aware of any sort of
17  automatic deletion policy that Resolute has with
18  respect to e-mails?
19  A  No.  I have no idea about that at
20  all.
21  Q  Okay.  How often would you have
22  sent, received, been copied on an e-mail regarding
23  the Powell account?
24  A  That's very hard to say.  Multiple

7 (Pages 22 to 25)

CIN-TEL CORPORATION

PH: 513-621-7723                                              FX: 513-263-9023

Page 26

1  times in a week.
2      Q  Over the course of the four years,
3  do you think it would have been more than a
4  thousand e-mails?
5      A  I would have to do the calculator.
6  I really would have no way to -- you know, it's
7  very -- I have to be honest.  It's been two years
8  since I handled the account.
9          My recollection was it was a
10 reasonably active account.  And whether or not it
11 was five e-mails a week for the whole four years,
12 I don't know.  So it would be a total guess on my
13 part.
14     Q  Okay.  Who at Resolute would you
15 have e-mailed with or would have sent you e-mails
16 with respect to the William Powell account?
17     A  Well, off the top of my head, I, you
18 know, would -- certainly the immediate folks that
19 we've already talked about, Peter Dinunzio, Chris
20 Dardis, Darilyn.
21         I recall from reviewing my affidavit
22 that I believe I put Cathy Murphy in there as
23 well, and I believe that's the extent of the
24 individuals that I would e-mail on the account.

Page 27

1      Q  Who is Cathy Murphy?
2      A  She works in our quantitative
3  analyst unit -- or quantitative analysis unit.
4      Q  What do they do?
5      A  They do any number of things.  But I
6  believe what I was -- what I believe I was
7  discussing with her -- well, I wasn't discussing,
8  I think I was just cc'd on it, but was an
9  allocation of losses through the William Powell
10 policies.
11     Q  How did you generate that Cathy
12 Murphy, Darilyn Michaud, Chris Dardis, Peter
13 Dinunzio list that's in your affidavit?  Did you
14 look at anything, or that was all by memory?
15     A  No.  It was largely by memory.  I
16 just sat here and tried to recall as best I could.
17     Q  Do you think you ever talked to
18 Christopher Basso?
19     A  I may have.
20     Q  Who is he?
21     A  He worked in our file room.
22     Q  What would you have spoken with him
23 about?
24     A  I really have no idea.  I wouldn't

Page 28

1  have -- I wouldn't be able to tell you what I
2  would have talked to him about.  But certainly
3  people in our file room, I -- you know, I talk to
4  on a regular basis.  So there may have been -- I
5  -- not that I can recall, but possibly.
6      Q  Would Darilyn have been on those
7  e-mails to Christopher Basso?
8      A  I -- if it was an e-mail with
9  respect to William Powell, I would think she would
10 be, but seeing as I don't recall the e-mail, I
11 wouldn't know.  You know, if I -- if -- I wouldn't
12 know.
13     Q  What about Darren Williams?
14     A  What's the question?
15     Q  Would you have ever e-mailed with
16 Darren Williams about the William Powell account?
17     A  Possibly.
18     Q  Who's Darren Williams?
19     A  She works in -- she works in our
20 payment unit, our claim payment unit.
21     Q  If you had e-mailed with her, would
22 you have included Darilyn on that e-mail or those
23 e-mails?
24     A  I would have to know the e-mail, but

Page 29

1  possibly.
2      Q  So possibly not?
3      A  I would assume I would have cc'd
4  Darilyn if it was a payment issue on a William
5  Powell account.
6          MR. GARNER:  Let me interject -- let
7      me interject here for a second.  For
8      purposes of the record, because you
9      haven't asked the questions, Katie, and
10     I just want to make sure I'm clear on
11     this because of the purpose of these
12     depositions.
13         Clayton, can you tell us what the
14     file room is and what the claim payment
15     unit is, just so we're clear what we're
16     talking about here.
17         MS. BARNES:  Actually, Rich, I don't
18     need that information, so I'm good.
19         MR. GARNER:  Yeah.  But I want to
20     have it on there, just so that way we
21     don't have a fight about this later on.
22     So if he can briefly answer that
23     question, we can go from there.
24         MS. BARNES:  Actually, can we wait

WWW.CINTELCORPORATION.COM                   E-Mail     CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH: 513-621-7723                                    FX: 513-263-9023

Page 30

1 until the end of my hour to make sure I
2 get all my questions in, and then if you
3 would like to ask him some questions at
4 that point, I'm happy to let you do
5 that. So I'm going to move on.
6     MR. GARNER: All right. Go ahead.
7   Q  Mr. Budlong, is there anyone at
8 OneBeacon -- I'm sorry. I'm sorry. Mr. Budlong,
9 we interrupted you. Was there anything else you
10 wanted to add about any e-mails you would have had
11 with Darren Williams?
12   A  I don't recall what I was saying.
13 I'm sorry.
14   Q  Okay. I apologize. Did you ever
15 e-mail with anyone at OneBeacon about the William
16 Powell account?
17   A  Not that I can recall.
18   Q  What about NICO?
19   A  Not that I can recall.
20   Q  And your -- the two names that I
21 just mentioned to you, did that jog your memory
22 about anyone else that you may have e-mailed about
23 the William Powell account?
24   A  What two names?

Page 31

1   Q  I mentioned Christopher Basso and
2 Darren Williams.
3   A  No. That doesn't do anything to
4 cause me to think of any additional people I may
5 have e-mailed on the account.
6   Q  I believe when we first started
7 talking you mentioned that you reported to Brooke
8 Green at one point?
9   A  Yes.
10   Q  Would you ever have e-mailed her
11 about the William Powell account?
12   A  I don't recall. I wouldn't think
13 so, but I don't -- and I don't recall. I could
14 have, but I don't recall.
15   Q  Would Darilyn have been on those
16 e-mails?
17   A  Yes.
18   Q  Okay. Did you speak to anyone
19 orally about the William Powell account while you
20 were a team leader?
21   A  Yes.
22   Q  How would you have spoken to people?
23   A  I think, as I said before, typically
24 it would be in the context of discussing a

Page 32

1 particular case and an evaluation of a particular
2 case.
3     So it could be Darilyn and I
4 speaking about the case and/or bringing in at the
5 time Peter Dinunzio and/or at the time Chris
6 Dardis. But that's generally -- you know, the
7 discussions that would be had would be with
8 respect to individual asbestos cases.
9   Q  Okay. Would these conversations
10 have occurred on the phone, or in person, or in a
11 group meeting?
12   A  Most probably in person in a group
13 meeting.
14   Q  How often would you have meetings
15 about individual asbestos claims?
16   A  It's really difficult to say on any
17 particular account. It -- you know, we could have
18 a situation where we're in a -- I don't recall --
19 I don't even independently recall the William
20 Powell account.
21     But, you know, you typically might
22 have trial groups, so that you might have a week
23 or two where you have a half a dozen plaintiffs
24 that you're evaluating, so you might meet a lot in

Page 33

1 those two or three weeks, and then you may go
2 another 30 or 45 days without any trials coming
3 up, so you wouldn't meet. It's really quite
4 arbitrary.
5   Q  Would you have taken notes during
6 these meetings?
7   A  Probably not.
8   Q  Do you ever take notes during
9 meetings?
10   A  Yes, I do.
11   Q  Where do you keep your notes?
12   A  It depends on the meeting. I -- you
13 know, it's not infrequent that I keep notes for a
14 meeting, do what I need to do, and then throw the
15 notes out.
16     I don't recall taking any notes with
17 respect to the William Powell meetings, but I can
18 tell you I know I don't have any lingering folders
19 of notes here from William Powell meetings.
20   Q  And you never met with anyone at
21 OneBeacon about the William Powell account?
22   A  No.
23   Q  Did you ever meet with anyone at
24 NICO?

9 (Pages 30 to 33)

WWW.CINTELCORPORATION.COM                 E-Mail   CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH: 513-621-7723                                    FX: 513-263-9023

Page 34

 1    A   No.
 2    Q   So in your affidavit you state that
 3  you believe that any correspondence that you were
 4  involved in concerning administration of claims
 5  against the William Powell account or claims made
 6  against William Powell would also involve
 7  Darilyn.
 8        What did you do to confirm this
 9  belief?  Did you look at any --
10    A   Well --
11    Q   I'm sorry.
12    A   It's the fact that it's Darilyn's
13  account, and so anything that I would have to say
14  about it would be said to Darilyn.
15    Q   But you didn't look at any of your
16  e-mails?
17    A   No.  No.
18    Q   Do you have any sort of automatic
19  e-mail rule that adds Darilyn to e-mails about The
20  William Powell Company?
21    A   No, I don't.
22    Q   Were you ever asked to review
23  Darilyn's performance with respect to the Powell
24  account?

Page 35

 1    A   No.
 2    Q   Do you know if Darilyn has any sort
 3  of document or e-mail retention rules or policies
 4  set up for her e-mails?
 5    A   No, I don't.
 6    Q   And you have no control over how
 7  long Darilyn retains e-mails, correct?
 8    A   That's correct.
 9    Q   When did you first learn of this
10  litigation?  And by that, I mean the complaint
11  that The William Powell Company filed against
12  Resolute for bad faith, among a number of other
13  claims.
14    A   I may have heard something about it
15  when it was first filed, although I believe it was
16  some time after Darilyn was working for me.  So I
17  may have heard about it then, but certainly I
18  heard about it in the context of giving my
19  affidavit.
20    Q   Have you ever seen Powell's
21  discovery requests?
22    A   No.
23        MR. GARNER:  Objection.  Don't
24    answer.  Privileged.  Well, go ahead.

Page 36

 1    The answer is -- go ahead and answer.
 2    A   No.
 3        MR. GARNER:  I talked over -- yeah.
 4    I talked over top of you, Clayton,
 5    again.  Thank you.
 6    Q   Has anyone ever mentioned Powell's
 7  discovery requests to you?
 8    A   No.
 9    Q   Have you ever searched your e-mails
10  or your computer or the V drive for documents
11  relating to Powell?
12    A   No.
13    Q   Has anyone else, to your knowledge,
14  ever searched your e-mails, computer, or the V
15  drive for documents relating to Powell?
16    A   Not that I know of.
17    Q   Do you have a password for your
18  computer?
19    A   Yes.
20    Q   Have you ever given that password to
21  anyone as a request to, you know, access your
22  e-mails --
23    A   No.
24    Q   -- related to Powell?

Page 37

 1        Okay.  Have you ever been instructed
 2  to save documents related to Powell?
 3    A   No.
 4    Q   Have you ever been instructed to not
 5  delete e-mails or other documents relating to
 6  Powell?
 7    A   Not that I can recall.
 8    Q   Have you deleted any documents
 9  related to Powell?
10    A   Historically, possibly, you know.  I
11  don't -- I don't recall independently doing it.
12  But, you know, in the course of handling, you
13  know, hundreds of e-mails on a daily basis, I --
14  you know, I delete e-mails.
15        So I wouldn't be able to say that I
16  never deleted an e-mail that related to Powell,
17  but I don't independently recollect it.
18    Q   Do you remember if you've deleted
19  any e-mails related to Powell since October of
20  2014?
21    A   No.  I wouldn't have after -- after,
22  no, I haven't.  I can tell you that, only because
23  there would be no reason for me to because Darilyn
24  didn't work for me at that time.  The only reason

10 (Pages 34 to 37)

CIN-TEL CORPORATION

PH: 513-621-7723                                                FX: 513-263-9023

Page 38

1   I would delete them is in the daily course of
2   working my e-mail.
3        Q   Got it.  Give me one minute,
4   please.  Okay.  Mr. Budlong, I just have a couple
5   more questions.
6            So going back to just the frequency
7   with which you e-mailed about Powell or the Powell
8   account or received e-mails, you previously
9   testified to, you know, five e-mails a week.  Do
10  you remember if you sent at least five e-mails a
11  week about the Powell account?
12       A   It's -- I really feel uncomfortable
13  about answering this, because it could be 30
14  e-mails, or it could be no e-mails on a given
15  week.  I would have to go back and review my
16  e-mails from 2010 to 2014 to see the frequency of
17  it occurring.
18           As I said, I know it was an active
19  account, so I'm just totally guessing five e-mails
20  a week on average, but I really just don't -- I
21  don't know.
22       Q   Okay.  You can't give any sort of
23  average that you're comfortable giving?
24       A   Again, because of the nature of

Page 39

1   asbestos accounts and that, you know, you can go
2   on a flurry of activity one week because of a
3   cluster of cases that come up, and on another --
4   and it could be quiet for three weeks.
5            It's just -- it's difficult to pin
6   -- you know, it's not like a regular -- it's
7   difficult to pin down an average number.
8        Q   Okay.  And then just my final
9   question to you is, did you review anything during
10  the course of this deposition?
11       A   No.
12           MS. BARNES:  Okay.  Great.  Well, I
13  appreciate your time, and that's all the
14  questions I have for you.
15           And now if Rich would like to clarify
16  anything, you know, feel free to do so,
17  Rich.
18           MR. GARNER:  No.  We'll leave it
19  there.  We'll reserve the right to read.
20           MS. BARNES:  Great.  Thanks a lot.
21           (Deposition concluded at 10:45 a.m.)
22
23
24

Page 40

1            A C K N O W L E D G E M E N T
2
3   STATE OF OHIO     :
4   COUNTY OF HAMILTON :
5
6      I, Clayton Budlong, have read the transcript
7   of my testimony, given as if under oath, on
8   December 8, 2016.
9      Having had the opportunity to note any
10  necessary corrections of my testimony on the errata
11  page, I hereby certify that the above-mentioned
12  transcript is a true and complete record of my
13  testimony.
14
15
16           _____
17                CLAYTON BUDLONG
18
19
20
21
22
23
24

Page 41

1              C E R T I F I C A T E
2
3      I, Renee Rogers, a notary public within
4   and for the State of Ohio, do hereby certify that
5   the within 40 pages were taken by me in stenotypy
6   and transcribed by computer-aided transcription,
7   and that this is a true, accurate, and complete
8   transcription of the same.
9
10          _____
11  My commission expires:     Renee Rogers
12  April 13, 2021      Notary Public-State of Ohio
13
14
15
16
17
18
19
20
21
22
23
24

11 (Pages 38 to 41)

WWW.CINTELCORPORATION.COM              E-Mail    CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH: 513-621-7723 FX: 513-263-9023

Page 42

**A**
a.m 1:16 2:17 39:21
able 28:1 37:15
above-mentioned 40:11
absolutely 19:8
access 22:1,3,10 36:21
account 11:15,16 12:22 14:8,10,20 14:24 16:3,6,7,10 16:17 17:14 18:4 18:9,11,11,24 19:22 20:16,21 21:8 23:14,20 24:8,20 25:5,23 26:8,10,16,24 28:16 29:5 30:16 30:23 31:5,11,19 32:17,20 33:21 34:5,13,24 38:8 38:11,19
accounts 10:23 11:10,13 12:14 14:20 15:14,16 18:7,22 19:1,2 20:9 39:1
accurate 10:15 16:14 41:7
acknowledged 9:2
active 26:10 38:18
activity 39:2
add 30:10
additional 17:2 31:4
adds 34:19
administer 14:17 23:20
administering 16:12
administration 15:13 34:4
affidavit 9:19,21,24 10:3,10,12 26:21

27:13 34:2 35:19
affixed 4:14
agendas 24:5
agreed 7:9
agreement 4:8
ahead 20:10 30:6 35:24 36:1
al 1:9 2:8
allocation 27:9
American 3:5
analysis 27:3
analyst 27:3
and/or 11:21 32:4,5
answer 20:7,11 22:13,13 29:22 35:24 36:1,1
answering 38:13
apologize 20:18 30:14
APPEARANCES 3:1
applied 14:19
appreciate 39:13
approve 13:17
April 41:12
arbitrary 33:4
argument 19:5
asbestos 11:22 12:5 13:6 14:4,12,18 15:20,22 16:7,13 16:18 17:3,4 18:7 32:8,15 39:1
asked 29:9 34:22
assigned 11:15
assistance 10:2
assume 29:3
assuming 18:8 24:24 25:9
attached 17:2
attachments 17:2
attendant 15:3 16:23
attending 24:7
authority 13:8,14

13:16,16,17,19,20 14:7,9,10,13,19 15:1,3 16:19 17:3 17:5
automatic 25:11,17 34:18
automatically 25:12
average 38:20,23 39:7
aware 20:17 25:16

**B**
B 5:6
back 20:19 38:6,15
bad 35:12
Barnes 3:3 5:4 6:1 6:2,7,14,21,23 7:6 7:15,18,24 8:7,15 8:18 9:6 18:18 19:3,13 29:17,24 39:12,20
basis 18:18,19,20 28:4 37:13
Basso 27:18 28:7 31:1
behalf 3:2,9
belief 34:9
believe 10:4,15 17:24 26:22,23 27:6,6 31:6 34:3 35:15
best 27:16
bodily 14:18
Boston 6:19
briefly 29:22
bringing 32:4
Brooke 12:8,10 31:7
brought 12:19
BRUNNER 3:4
Budlong 1:14 2:12 4:5 5:3 6:1,12,17 9:1 19:19 30:7,8

38:4 40:6,17

**C**
C 40:1 41:1,1
calculator 26:5
calculators 18:2
call 22:8
capacity 7:18,20,21 7:23
care 19:14
case 1:8 2:7 9:21 22:6 32:1,2,4
cases 24:11 32:8 39:3
Cathy 26:22 27:1 27:11
cause 31:4
cc'd 27:8 29:3
certainly 18:6 26:18 28:2 35:17
certify 40:11 41:4
change 14:14
Chris 11:21,23 14:1 24:18 26:19 27:12 32:5
Christopher 27:18 28:7 31:1
Cin-Tel 2:22
Cincinnati 2:17,23 3:6
circumstance 16:5
Civil 4:7
claim 28:20 29:14
claims 11:22 13:6,9 14:18 15:18,20,23 16:13 19:10 32:15 34:4,5 35:13
clarify 39:15
Clayton 1:14 2:12 4:5 5:3 6:11 9:1 19:16 20:7 29:13 36:4 40:6,17
clear 7:7 29:10,15
clearly 8:16

clients 19:10
cluster 39:3
Collins 3:11
come 17:5,17,23 21:18 39:3
comfortable 38:23
coming 33:2
commission 41:11
communications 23:10
Company 1:6,9 2:5 2:8 3:9 6:10,16 10:22 34:20 35:11
Company's 10:23
complaint 35:10
complete 40:12 41:7
computer 7:2 36:10 36:14,18
computer-aided 41:6
concern 19:15
concerning 21:11 22:2 23:6 34:4
concluded 39:21
confirm 34:8
considered 7:10
context 12:23 17:13 31:24 35:18
control 35:6
conversations 32:9
copied 25:22
copy 17:6 20:24 21:19
Corporation 2:22
correct 9:22,23 10:20 13:21 14:21 25:6 35:7,8
corrections 40:10
correspond 23:12
correspondence 23:11 34:3
counsel 4:3,8 10:7 10:10 16:24

WWW.CINTELCORPORATION.COM      E-Mail     CINTELCO@GMAIL.COM

**COUNTY** 40:4
**couple** 13:2,2 38:4
**course** 26:2 37:12
  38:1 39:10
**court** 1:1 2:1 7:7
  8:12,22
**created** 25:3
**creating** 15:12
**Cross** 5:4
**cross-examination**
  2:14 4:6 9:5
**current** 10:18
**currently** 10:21

**D**

**D** 5:1 40:1
**daily** 37:13 38:1
**Dardis** 11:21 14:1
  24:18 26:20 27:12
  32:6
**Dardis's** 11:24
**Darilyn** 11:14
  12:15 17:19,23,24
  24:17,18 26:20
  27:12 28:6,22
  29:4 31:15 32:3
  34:7,14,19 35:2,7
  35:16 37:23
**Darilyn's** 13:15
  34:12,23
**Darren** 28:13,16,18
  30:11 31:2
**David** 3:3 12:9
**days** 33:2
**dealing** 19:24 20:2
**December** 1:15
  2:18 40:8
**decision** 14:5
**declaration** 9:21
  15:24
**Defendant** 3:9
**Defendants** 1:10
  2:9
**defense** 16:24

**delete** 25:14 37:5
  37:14 38:1
**deleted** 37:8,16,18
**deletes** 25:12
**deletion** 25:17
**Depending** 24:16
**depends** 33:12
**deponent** 4:12
**deposed** 7:16
**deposition** 1:14
  2:12 4:4,9,12 7:1
  9:8,17 39:10,21
**depositions** 20:2
  29:12
**desktop** 23:5
**details** 20:8
**dfhine@vorys.com**
  3:7
**different** 11:19
  12:16
**difficult** 8:12 32:16
  39:5,7
**Dinunzio** 11:21
  12:3 24:18 26:19
  27:13 32:5
**discovery** 20:3
  35:21 36:7
**discuss** 24:11
**discussing** 27:7,7
  31:24
**discussions** 9:15
  32:7
**DISTRICT** 1:1,2
  2:1,2
**DIVISION** 1:3 2:3
**document** 7:2 23:9
  35:3
**documentary** 20:3
**documents** 9:16
  10:8 16:16,23
  21:5,16 22:5,14
  22:17,19,22 23:4
  36:10,15 37:2,5,8
**doing** 20:9 37:11

**dozen** 32:23
**draft** 9:24 10:7
**drafting** 10:3
**drive** 22:9,11,11,15
  22:21,24 23:5
  36:10,15
**Dublin** 3:12
**duties** 14:23

**E**

**E** 5:1,6 40:1,1,1
  41:1,1
**e-mail** 17:6,7,18
  20:23 21:18,21,23
  23:15,20,22 25:22
  26:24 28:8,10,22
  28:24 30:15 34:19
  35:3 37:16 38:2
**e-mailed** 26:15
  28:15,21 30:22
  31:5,10 38:7
**e-mails** 16:18 17:20
  24:19 25:18 26:4
  26:11,15 28:7,23
  30:10 31:16 34:16
  34:19 35:4,7 36:9
  36:14,22 37:5,13
  37:14,19 38:8,9
  38:10,14,14,16,19
**East** 2:16 3:5
**effective** 14:17
**either** 11:21 24:17
**electronic** 21:18
**employee** 7:19
**employment** 7:22
**ensure** 15:16
**errata** 40:10
**especially** 8:8
**ESQ** 3:3,3,4,11
**Essentially** 23:19
**established** 14:4
**establishing** 15:21
**et** 1:9 2:8
**evaluate** 15:5

**evaluating** 15:6
  32:24
**evaluation** 32:1
**evaluations** 11:22
**exactly** 10:5 12:21
**examination** 4:13
**examined** 9:3
**excess** 13:15
**execute** 9:20
**exhibits** 5:8
**expires** 41:11
**exposure** 17:8,11
  17:16 19:21 20:15
  20:20
**extent** 15:6,21
  19:24 23:21 24:21
  24:23 26:23

**F**

**F** 3:3 41:1
**fact** 34:12
**failed** 6:15
**faith** 35:12
**far** 25:11
**fashion** 15:17 22:23
**Federal** 4:7
**feel** 38:12 39:16
**fell** 15:14
**felt** 14:17 16:13
**fight** 29:21
**file** 21:10,13 27:21
  28:3 29:14
**filed** 35:11,15
**final** 39:8
**fine** 18:24
**first** 31:6 35:9,15
**five** 26:11 38:9,10
  38:19
**flurry** 39:2
**focus** 23:10
**folder** 23:22 25:4,7
**folderized** 22:22
**folders** 24:22,23
  25:1 33:18

**folks** 13:2,3 26:18
**follows** 9:4
**format** 20:23 21:18
**formulate** 15:7
**forth** 2:15
**four** 26:2,11
**Fourth** 2:16 3:5
**frame** 11:5,9,20
  13:5 24:16
**free** 39:16
**frequency** 38:6,16

**G**

**G** 3:3 40:1
**Garner** 3:11,11 6:8
  6:9 9:10 18:14,19
  19:8,16,23 29:6
  29:19 30:6 35:23
  36:3 39:18
**general** 15:17 16:2
  20:14
**generally** 15:8 20:5
  23:9 32:6
**generate** 27:11
**give** 8:9 38:3,22
**given** 9:3 36:20
  38:14 40:7
**giving** 35:18 38:23
**go** 14:1 20:9 29:23
  30:6 33:1 35:24
  36:1 38:15 39:1
**goes** 25:12
**going** 7:12 8:1,19
  11:8 19:23 20:8
  20:10,18 23:10
  30:5 38:6
**Gold** 12:9
**good** 15:17 29:18
**Great** 3:5 7:15 8:18
  9:20 39:12,20
**Green** 12:8,10 31:8
**Greg** 12:24
**group** 32:11,12
**groups** 32:22

CIN-TEL CORPORATION

PH: 513-621-7723                                    FX: 513-263-9023

**guess** 19:4 26:12
**guessing** 38:19
**guys** 9:11

**H**

**H** 5:6
**half** 32:23
**HAMILTON** 40:4
**handle** 13:6
**handled** 15:16 19:2 26:8
**handling** 15:18,20 16:2,12 37:12
**handwritten** 23:17
**happened** 13:23
**happy** 30:4
**hard** 8:19,22 17:5 21:19 23:5 25:24
**hate** 18:7
**head** 26:17
**headed** 12:5
**hear** 8:15
**heard** 35:14,17,18
**hereinafter** 2:15
**HINE** 3:3
**Historically** 37:10
**Hold** 18:14
**honest** 10:5 26:7
**hour** 9:13 30:1
**hundreds** 37:13

**I**

**idea** 25:19 27:24
**identify** 6:5
**immediate** 26:18
**implementing** 15:12
**important** 8:8
**in-box** 25:4
**included** 28:22
**INDEMNITY** 1:9 2:8
**independent** 17:15
**independently**
  17:11 22:4 32:19 37:11,17
**individual** 24:10 25:4 32:8,15
**individuals** 13:1 26:24
**information** 10:9 15:5 19:6,12 29:18
**infrequent** 33:13
**injury** 14:18
**instant** 23:24 24:1
**instruct** 20:11
**instructed** 37:1,4
**Insurance** 3:9 6:10
**insureds** 15:19
**interchange** 16:6
**interject** 29:6,7
**internally** 14:15
**interoffice** 21:20
**interrupted** 30:9
**involve** 34:6
**involved** 11:10 13:1 16:1 34:4
**involvement** 10:22 15:21
**issue** 29:4
**issues** 20:3 24:11

**J**

**jmbrunner@vor...** 3:8
**job** 11:24 12:1,4
**jog** 30:21
**JOSEPH** 3:4

**K**

**K** 40:1
**Katherine** 3:3 6:6
**Katie** 6:2,6 18:17 29:9
**keep** 33:11,13
**kgbarnes@vorys...** 3:7

**kind** 20:6
**know** 7:2,4,9 8:4 9:14,16 10:6 12:17 14:14 15:1 16:9 18:6 22:4,12 22:13 23:19,24 24:23 25:10,10,13 26:6,12,18 28:3 28:11,11,12,24 32:6,17,21 33:13 33:18 35:2 36:16 36:21 37:10,12,13 37:14 38:9,18,21 39:1,6,16
**knowledge** 36:13

**L**

**L** 4:1 40:1
**laptop's** 23:5
**largely** 27:15
**leader** 6:12 10:19 11:4,10,12 12:2 12:19,20 13:13 15:16 16:17 17:21 21:7 31:20
**leaders** 14:6,11
**learn** 35:9
**leave** 39:18
**letter** 23:17
**limited** 20:2
**lingering** 33:18
**list** 27:13
**litigation** 35:10
**LLC** 3:11
**LLP** 2:16 3:4
**long** 9:11 35:7
**long-term** 25:13
**look** 22:24 27:14 34:9,15
**looked** 16:5,8,10
**looking** 6:24
**losses** 27:9
**lot** 32:24 39:20

**M**

**M** 3:4,11 40:1
**machinations** 12:21
**mail** 21:20
**Management** 6:13
**manager** 11:14,15
**managers** 12:22 14:8,11
**marked** 5:8
**Massachusetts** 6:20
**maximum** 13:16
**mean** 13:19 18:12 18:13 35:10
**meaning** 15:3,18 18:1
**meant** 16:3
**medical** 17:1
**meet** 9:10,11 32:24 33:3,23
**meeting** 24:4,8,12 32:11,13 33:12,14
**meetings** 24:10,15 32:14 33:6,9,17 33:19
**memory** 10:11 27:14,15 30:21
**mention** 6:15
**mentioned** 10:18 30:21 31:1,7 36:6
**messaging** 23:24 24:2
**met** 33:20
**Metro** 3:12
**Michaud** 11:15 27:12
**minute** 38:3
**minutes** 9:12,13
**modeling** 17:9,12 17:13,16 18:1,2 18:10,13 19:21 20:15,20
**monitoring** 15:22
**move** 12:18 30:5

**Multiple** 25:24
**Murphy** 26:22 27:1 27:12
**mute** 18:15 19:17

**N**

**N** 4:1 5:1 40:1,1
**nah** 8:11
**name** 6:1,8,11 22:8
**names** 30:20,24
**NATIONAL** 1:9 2:8
**nature** 22:20 38:24
**necessary** 40:10
**need** 7:13 29:18 33:14
**network** 22:2,3,7,9
**never** 21:13 33:20 37:16
**new** 12:19
**NICO** 30:18 33:24
**notary** 2:19 4:10,14 41:3,12
**note** 23:16,17 40:9
**notes** 33:5,8,11,13 33:15,16,19
**notice** 2:14 4:8
**number** 18:7 27:5 35:12 39:7

**O**

**O** 4:1 40:1
**oath** 7:10,12 9:3 40:7
**object** 18:16 19:24
**Objection** 35:23
**objectionable** 20:6
**occur** 18:10 19:22 20:16
**occurred** 20:20 21:2 32:10
**occurring** 38:17
**October** 37:19
**office** 6:21

WWW.CINTELCORPORATION.COM                E-Mail    CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH: 513-621-7723 FX: 513-263-9023

Page 45

offices 2:15
Ohio 1:2 2:2,17,20
  2:23 3:6,12 40:3
  41:4,12
Okay 6:23 7:24 8:6
  8:14,18,24 9:14
  9:20 10:2,8 11:11
  11:23 12:6,10
  13:4,18 15:7,24
  16:15 19:16 21:4
  21:22 22:1 23:4
  23:23 24:4,19
  25:7,21 26:14
  30:14 31:18 32:9
  37:1 38:4,22 39:8
  39:12
old 12:19
Once 6:6
OneBeacon 3:9 6:9
  30:8,15 33:21
ongoing 19:9
opportunity 40:9
opposed 8:10
orally 31:19
order 10:9
Outlook 25:2,8
outside 4:14
overall 15:20

          P
P 4:1
page 5:3 40:11
pages 41:5
paragraph 16:1
part 14:5 16:16
  26:13
particular 32:1,1
  32:17
parties 4:4
passed 14:12
password 36:17,20
payment 28:20,20
  29:4,14
Pease 2:16 3:4

people 23:13 28:3
  31:4,22
performance 34:23
person 32:10,12
personal 13:14,15
  13:19 14:6,9,10
Peter 11:21 12:3
  24:17 26:19 27:12
  32:5
phone 7:8 32:10
physical 21:10,13
pick 8:12
pin 39:5,7
place 3:12 4:9
  19:20
plaintiff 1:7 2:6,13
  3:2 4:6 24:10
plaintiffs 32:23
please 6:24 7:4 8:3
  38:4
point 21:2 30:4
  31:8
policies 15:8,12,22
  16:2,10,11,12
  27:10 35:3
policy 19:20 20:15
  25:17
positive 18:3
possible 24:9
possibly 17:1,1,23
  28:5,17 29:1,2
  37:10
Powell 1:6 2:5 6:16
  10:22,23 11:10,13
  11:16 12:14 13:5
  13:10 14:20,24
  16:3,6,10,17
  17:14 18:4,9,24
  19:11 20:1,21
  21:8,11,14 22:2,5
  22:11,15,21 23:1
  23:6,11,13 24:8
  24:20 25:5,23
  26:16 27:9 28:9

28:16 29:5 30:16
  30:23 31:11,19
  32:20 33:17,19,21
  34:5,6,20,23
  35:11 36:11,15,24
  37:2,6,9,16,19
  38:7,7,11
Powell's 22:11
  35:20 36:6
practice 15:18
preferably 8:10
preparation 9:17
prepare 9:7,9
presence 4:11,14
previously 11:1
  21:6 38:8
prior 9:10
privilege 18:20,20
privileged 19:4,7,9
  20:12 35:24
privy 17:21
probably 9:12
  32:12 33:7
procedure 4:7
  19:20 20:15
procedures 15:8,13
Professional 1:24
  2:19
provide 10:9
provided 16:24
public 2:19 41:3
public-court 4:10
  4:15
Public-State 41:12
purpose 29:11
purposes 29:8
pursuant 2:14 4:6
  4:7
purview 15:14
put 23:22 24:22
  26:22

          Q
quantitative 27:2,3

question 8:5 13:7
  15:10 16:9 19:14
  20:6,13 28:14
  29:23 39:9
questions 6:3 8:2,3
  11:8 29:9 30:2,3
  38:5 39:14
quick 19:18
quiet 39:4
quite 17:23 24:9
  33:3

          R
R 41:1
read 39:19 40:6
really 16:4,11 26:6
  27:24 32:16 33:3
  38:12,20
reason 7:3 37:23,24
reasonably 26:10
recall 10:4,5 12:21
  13:1 17:11,24
  23:3,7,18 24:6,7
  26:21 27:16 28:5
  28:10 30:12,17,19
  31:12,13,14 32:18
  32:19 33:16 37:7
  37:11
receive 21:19
received 25:22 38:8
recollect 37:17
recollection 17:15
  26:9
record 6:5 29:8
  40:12
refer 7:3
refrain 6:24
regarding 23:11
  24:20 25:22
Registered 1:24
  2:18
regular 28:4 39:6
relate 11:8
related 36:24 37:2

37:9,16,19
relating 36:11,15
  37:5
relevancy 19:5
remember 11:23
  37:18 38:10
Renee 1:24 2:18
  41:3,11
reorganization
  12:18 14:5
reorganized 14:3
repeat 20:13
replace 12:19
report 12:6
reported 1:23 12:7
  12:8 31:7
reporter 1:24 2:19
  4:10,15 7:7 8:12
  8:23
reports 17:1
represent 6:9,15
request 13:22,24
  36:21
requests 13:17
  16:18 17:3,4
  35:21 36:7
reserve 39:19
Resolute 6:13 7:19
  7:22 10:19 12:11
  19:20 20:14 24:1
  25:17 26:14 35:12
respect 11:22 14:24
  15:13,22 24:10
  25:18 26:16 28:9
  32:8 33:17 34:23
respective 4:4
response 8:9
responsibilities
  14:23
responsibility 13:9
  15:15
responsible 15:11
responsiveness
  15:19

CIN-TEL CORPORATION

PH: 513-621-7723 FX: 513-263-9023

Page 46

**restate** 15:9,10 19:13
**retain** 14:8
**retains** 35:7
**retention** 35:3
**review** 9:16 10:8,12 13:14 14:12 15:19 34:22 38:15 39:9
**reviewed** 9:18 21:7 21:17
**reviewing** 15:4 26:21
**rgarner@crugla...** 3:13
**Rich** 7:8 29:17 39:15,17
**Richard** 3:11 6:8
**right** 6:17 8:16 19:11 30:6 39:19
**Roche** 3:11
**Rogers** 1:24 2:18 41:3,11
**role** 10:18 11:3,12 11:18,24 14:22 16:16 21:7
**room** 27:21 28:3 29:14
**rule** 34:19
**rules** 4:7 35:3

**S**

**S** 4:1,1 5:6
**sat** 27:16
**Sater** 2:15 3:4
**save** 22:14,22 23:4 23:21 24:19 37:2
**saved** 24:5
**saw** 17:13 18:8 20:23,23
**saying** 30:12
**searched** 36:9,14
**second** 29:7
**see** 16:16 17:8 18:6 19:11 38:16

**seeing** 28:10
**seen** 18:4 21:7 35:20
**sent** 23:16 25:22 26:15 38:10
**set** 2:15 16:9 35:4
**setting** 16:2,11
**settlement** 13:17,20 13:23 15:1,3 16:19 17:3,5
**Seymour** 2:16 3:4
**shared** 22:2,3,7,9 22:18
**signature** 4:13,13
**signed** 10:13,16
**simply** 20:2
**situation** 32:18
**sorry** 16:22 18:15 19:16 30:8,8,13 34:11
**sort** 16:15 17:8 19:19 21:19 22:17 23:23 24:1 25:13 25:16 34:18 35:2 38:22
**South** 3:12
**SOUTHERN** 1:2 2:2
**space** 22:2,4,18,22
**speak** 8:19,21 31:18
**speaking** 20:5 23:8 32:4
**specific** 13:6,9
**specifically** 11:7
**spoke** 19:21
**spoken** 27:22 31:22
**started** 31:6
**state** 2:20 11:7 34:2 40:3 41:4
**statement** 16:5
**STATES** 1:1 2:1
**stating** 18:5 20:15
**stenotype** 4:9

**stenotypy** 41:5
**step** 20:4
**stipulated** 4:3
**stipulations** 2:14
**stop** 12:13
**storage** 25:13
**Strategic** 12:5 14:4 14:13
**Street** 2:16,22 3:5
**submissions** 13:15 15:4
**submitted** 4:12 14:11
**substance** 9:15
**sufficient** 15:5
**Suite** 2:16,22 3:12
**sure** 12:4 15:4,11 20:14,19,22 22:20 25:9 29:10 30:1
**surprise** 17:12
**swapped** 12:22
**swear** 7:8
**Sycamore** 2:22
**system** 23:24 24:2 25:11

**T**

**T** 4:1,1 5:6 40:1 41:1,1
**take** 8:23 19:14 33:8
**taken** 2:13 4:5,9 33:5 41:5
**talk** 18:23 28:3
**talked** 26:19 27:17 28:2 36:3,4
**talking** 18:21 19:9 29:16 31:7
**team** 6:12 10:19 11:4,9,12 12:1,16 12:16,19,20 13:13 14:6,11 15:15 16:16 17:20 21:7 31:20

**telephone** 3:10 8:8
**telephonic** 1:14 2:12 4:4
**tell** 7:13 13:12 28:1 29:13 33:18 37:22
**testified** 9:3 21:6 21:16,17 24:22 38:9
**testimony** 7:9,12 9:2 20:19,22 40:7 40:10,13
**Thank** 6:14 36:5
**Thanks** 39:20
**thing** 9:9,18
**things** 27:5
**think** 12:24 18:2 19:4,6 20:5 21:5,9 22:12 23:19 24:12 25:12 26:3 27:8 27:17 28:9 31:4 31:12,23
**thousand** 26:4
**three** 16:1 33:1 39:4
**throw** 33:14
**Thursday** 2:17
**time** 4:5,8 11:5,9 11:20,24 12:1 13:5 24:16 32:5,5 35:16 37:24 39:13
**timely** 15:17,18,18 15:19
**times** 11:19 26:1
**title** 11:24 12:1,4
**today** 9:16
**top** 26:17 36:4
**total** 9:13 26:12
**totally** 12:20 38:19
**Tower** 3:5
**transcribed** 4:10 41:6
**transcript** 40:6,12
**transcription** 41:6 41:8

**transferred** 12:15
**trial** 32:22
**trials** 33:2
**tried** 27:16
**true** 40:12 41:7
**truth** 7:13
**try** 8:19,21 19:14
**two** 26:7 30:20,24 32:23 33:1
**type** 23:24
**typically** 17:5,22 21:17 23:12 31:23 32:21

**U**

**U** 4:1
**ultimate** 14:13
**unclear** 8:3
**uncomfortable** 38:12
**understand** 7:11 8:1,5 13:7
**understanding** 14:16 21:1
**unit** 12:5 14:4,13 27:3,3 28:20,20 29:15
**UNITED** 1:1 2:1
**Utley** 3:11

**V**

**V** 22:9,11,11,14,21 22:24 36:10,14
**valuation** 24:11
**verbal** 8:9
**Vorys** 2:15 3:4
**vs** 1:8 2:7

**W**

**W** 40:1
**wait** 18:14 29:24
**want** 7:6 9:14 18:16,16,23 20:4 29:10,19
**wanted** 30:10

CIN-TEL CORPORATION

PH: 513-621-7723 FX: 513-263-9023

Page 47

| | | |
|---|---|---|
| **wasn't** 27:7<br>**way** 14:17 20:4<br>   26:6 29:20<br>**We'll** 39:18,19<br>**we're** 18:21 19:9<br>   29:15,15 32:18<br>**we've** 26:19<br>**week** 26:1,11 32:22<br>   38:9,11,15,20<br>   39:2<br>**weeks** 33:1 39:4<br>**went** 13:2,3<br>**WESTERN** 1:3 2:3<br>**William** 1:6 2:5<br>   6:16 10:22,23<br>   11:10,13,16 12:14<br>   14:24 16:3,6,10<br>   16:17 17:14 18:4<br>   18:9,24 19:11<br>   20:1,20 21:8<br>   23:13 24:8 26:16<br>   27:9 28:9,16 29:4<br>   30:15,23 31:11,19<br>   32:19 33:17,19,21<br>   34:5,6,20 35:11<br>**Williams** 28:13,16<br>   28:18 30:11 31:2<br>**witness** 2:13 4:11<br>   5:2 6:11,19,22 7:5<br>   7:14,17,21 8:6,14<br>   8:17,24<br>**work** 8:4 11:17<br>   37:24<br>**worked** 10:6 11:14<br>   11:20 13:5 27:21<br>**working** 12:13<br>   35:16 38:2<br>**works** 27:2 28:19<br>   28:19<br>**wouldn't** 27:24<br>   28:1,11,11 31:12<br>   33:3 37:15,21<br>**written** 16:15 21:4<br>   23:9 | **X**<br>**X** 5:1,6<br><br>**Y**<br>**yeah** 8:11 16:4<br>   17:13 29:19 36:3<br>**years** 26:2,7,11<br>**yesterday** 9:10<br><br>**Z**<br><br>**0**<br><br>**1**<br>**1:14-CV-00807** 1:9<br>   2:8<br>**10:02** 1:16 2:17<br>**10:45** 39:21<br>**103** 2:22<br>**13** 41:12<br><br>**2**<br>**200** 3:12<br>**2010** 11:6,20 12:7<br>   13:4,13,24 14:22<br>   38:16<br>**2010-2014** 11:9<br>**2013** 12:7,8 13:13<br>   13:24 14:2,3<br>**2014** 11:6,20 12:8<br>   13:5 14:2,22<br>   37:20 38:16<br>**2016** 1:15 2:18 40:8<br>**2021** 41:12<br><br>**3**<br>**30** 33:2 38:13<br>**301** 2:16 3:5<br>**3500** 2:17 3:5<br><br>**4**<br>**40** 41:5<br>**43017** 3:12<br>**45** 9:12,12 33:2<br>**45202** 2:23 3:6 | **5**<br>**50,000** 13:14,16,19<br>   13:23 15:1<br>**513** 2:23 3:6<br><br>**6**<br>**614** 3:13<br>**621-7723** 2:23<br>**655** 3:12<br><br>**7**<br>**723-4000** 3:6<br><br>**8**<br>**8** 1:15 2:18 40:8<br>**810** 2:22<br><br>**9**<br>**9** 5:4<br>**901-9600** 3:13 |