# Exhibit B

## IN THE COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| THE WILLIAM POWELL COMPANY | ) | CASE NO.  A1109350 |
| | ) | |
| Plaintiff | ) | JUDGE PATRICK T. DINKELACKER |
| | ) | |
| -vs- | ) | **DEFENDANT ONEBEACON** |
| | ) | **INSURANCE COMPANY'S TRIAL** |
| ONEBEACON INSURANCE COMPANY | ) | **BRIEF** |
| | ) | |
| Defendant | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| NATIONAL UNION FIRE INSURANCE | ) | |
| COMPANY OF PITTSBURGH, PA., ET | ) | |
| AL. | ) | |
| | ) | |
| Third-Party Defendants | ) | |

# Table of Contents

I.   Introduction ................................................................................................... 1

II.  Background .................................................................................................... 4

    A.   WPC's Insurance Program ........................................................................ 4

    B.   The Handling of the WPC Asbestos Claims ............................................ 5

III. Law & Argument ........................................................................................... 11

    A.   WPC cannot allocate payments to OneBeacon's excess policies because OneBeacon's excess policies are not presently triggered by WPC's Asbestos Claims. ................................................................................. 11

        1.   Under *Goodyear*, allocation can only be made to triggered policies. ..................... 11

        2.   The OneBeacon excess policies are not yet triggered because there remains underlying insurance that is unexhausted. ................................ 12

        3.   The 1972-1975 and 1975-1976 OneBeacon excess policies are not triggered because WPC's Asbestos Claims are barred by pollution exclusions. .............. 22

    B.   WPC's allocation claim fails because: (1) OneBeacon's excess policies are not triggered; and (2) OneBeacon's primary policies are fully exhausted rendering primary allocation moot. .......................................... 24

    C.   Additional reasons that WPC's Allocation Claim is Without Merit ...................... 25

        1.   WPC waived its allocation rights. ................................................................. 25

        2.   WPC's allocation claim is barred by laches. ................................................ 28

        3.   The $250K SIR in the NUFIC Policy does not preclude OneBeacon from seeking contribution against WPC ......................................................... 29

    D.   OneBeacon is Entitled to Contribution from the Later-Settling Insurers ............. 32

    E.   The Directed Verdict Standard .................................................................. 41

IV.  Conclusion ................................................................................................... 42

## I.  Introduction

For nearly two decades, Plaintiff The William Powell Company ("WPC") has been the subject of more than 26,000 claims alleging bodily injury damages due to exposure to asbestos in WPC's products ("WPC Asbestos Claims").  Filings of new WPC Asbestos Claims are expected to continue steadily for the foreseeable future.

In 2002, WPC tendered defense and indemnity of the WPC Asbestos Claims to all of the insurers that are parties in this case and then provided them with regular updates.  For more than a decade, however, only Defendant OneBeacon Insurance Company ("OneBeacon") provided defense and indemnity for the WPC Asbestos Claims,[1] in the process expending nearly $80 million $25,229.600.43 in indemnity; $53,101,640.33 in defense) under the thirteen primary and excess insurance policies its predecessor had issued to WPC.

In 2011, as OneBeacon's primary policies began to exhaust by payment, two important developments occurred.  First, rather than leaving WPC without any responsive coverage, OneBeacon agreed to start paying a share of defense and indemnity payments under its excess policies—but expressly advised WPC that the excess policies had not yet been triggered due to the availability of additional primary policies, and reserved the right to seek reimbursement, recoupment or contribution with respect to any such payments.  Second, WPC commenced this action against OneBeacon with the principal apparent goal of increasing the available limits for OneBeacon's pre-1965 primary policies.  Despite this Court's rulings adopting WPC's view of the limits provided by OneBeacon's pre-1965 primary policies, these limits remained insufficient to satisfy the WPC Asbestos Claims.  Today, WPC calculates that out of the $22,600,000 combined

---

[1]  In 2012-2013, Intervener Federal Insurance Company ("Federal") made a series of indemnity payments totaling just under $500K.  Federal did not pay any defense payments.

limits initially available under OneBeacon's ten primary policies, only $932,229 of limits remain under three of these policies (1970-1971 [$137,378]; 1975-1976 [$283,299];1976-1977 [$511,551]). WPC's calculations also show that OneBeacon has paid $4,269,467 under its excess policies.

Under these facts advanced by WPC, the sole allocation issue remaining between OneBeacon and WPC is whether WPC can presently allocate to any of OneBeacon's excess policies. As explained in greater detail below, WPC concedes that OneBeacon's excess policies can only be triggered if all scheduled and unscheduled underlying insurance has been exhausted. While WPC argues that insurance issued by other insurers, such as Third-Party Defendant National Union Fire Insurance Company of Pittsburgh, PA ("NUFIC"), does not constitute unscheduled underlying insurance that must be exhausted before OneBeacon's excess policies are triggered, WPC concedes that OneBeacon's own primary policies do constitute underlying insurance for purposes of triggering the excess policies. Accordingly, there can be no dispute that the OneBeacon excess policies cannot be triggered until all of the OneBeacon primary policies are exhausted. Therefore, the $4,269,467 that WPC calculates has been paid under the OneBeacon excess policies must first be applied to the remaining limits in OneBeacon's primary layer before any portion of the balance can be applied to any excess policies. As explained below, even once the OneBeacon primary policies are exhausted, the requirements for triggering the OneBeacon excess policies still have not been met due to the remaining availability of other underlying insurance.

Last month, WPC informed this Court that—so far as WPC is concerned—the only remaining issue between WPC and OneBeacon is "whether Powell has waived its right to control allocation, as guaranteed by the Supreme Court of Ohio in *Goodyear Tire & Rubber Co. v. Aetna*

–2–

*Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842 . . . Allocation is the right of the insured to specify which policies respond to and pay for which claims." However, under *Goodyear*, WPC is only "permitted to choose, from a pool of ***triggered*** primary policies, a single primary policy against which it desires to make a claim. In the event that this policy does not cover [WPC's] entire claim, then [WPC] may pursue coverage under other primary or excess insurance policies." 2002-Ohio-2842, at ¶12 (Emphasis added). Accordingly, allocation can only take place ***after it is determined which policies are triggered***. *Id*., at ¶6 ("This 'all sums' approach allows [WPC] to seek full coverage for its claims from any single policy, up to that policy's coverage limits, out of the group of policies ***that has been triggered***")(Emphasis added). *See also Pa. Gen. Ins. Co. v. Park-Ohio Industries*, 126 Ohio St.3d 98, 2010-Ohio-2745, at ¶¶11-12. Under *Goodyear*, trigger is determined by policy language. *Goodyear*, 2002-Ohio-2842, ¶12 (explaining that court could not determine whether excess insurance could be triggered because "the question of what insurance may be tapped next is dependent upon the terms of the particular policy"). For seven years, OneBeacon has been arguing that its excess policies are not triggered, but until recently WPC has successfully argued that the issue has not yet become justiciable.

For the reasons that follow, WPC's allocation claim fails as a matter of law and this Court should enter judgment for OneBeacon on allocation. In this regard, OneBeacon is entitled to a judgment declaring that: (1) all of OneBeacon's primary policies are exhausted; and (2) OneBeacon's excess policies are not yet triggered because Policy No. GLAL53-34242 issued by NUFIC to WPC, effective July 26, 1977 until July 26, 1979 ("NUFIC Policy," Ex. 4) constitutes collectible, underlying insurance that has not yet been exhausted.

–3–

## II.     Background

## A.     WPC's Insurance Program

The parties to this case are WPC and various primary and excess insurers that issued policies to WPC from 1955 until 1987.  Historically, WPC has taken the position that its primary insurers during this time frame were:  OneBeacon (1955-1977), NUFIC (1977-1979) and Reliance (1979-1987).  The remainder of the insurers (including OneBeacon with respect to its excess policies) were excess insurers.   On multiple occasions, WPC has graphically represented this historical coverage to all of the insurers in the following chart:



This coverage chart has often been accompanied by another WPC-created chart designating

OneBeacon, NUFIC and Reliance as its "primary" insurers.

### B.     The Handling of the WPC Asbestos Claims

When the WPC Asbestos Claims were first tendered, OneBeacon and Reliance promptly responded.  Reliance, however, became insolvent and did not participate in the defense or indemnity of the WPC Asbestos Claims thereafter. As early as 2002, NUFIC acknowledged that WPC's tender was to it as a "primary" insurer, but NUFIC was unable to locate an applicable policy and, over time, had considerable problems with determining whether it had issued any applicable coverage.  It was subsequently determined that although the NUFIC Policy was a primary policy, it had a $250,000 self-insured retention ("SIR") that was sufficiently high that none of WPC's Asbestos Claims appeared likely to be large enough to exceed it.  Consequently, OneBeacon's primary policies paid 100% defense and indemnity.

Contrary to WPC's contentions, OneBeacon never "conceal[ed]" the manner in which it was allocating coverage under its primary policies until 2011, and the evidentiary record is clear that WPC knew from "very early on" that OneBeacon was allocating payments across the OneBeacon primary policies *on a horizontal basis*.  For example, on March 23, 2006, WPC's then current coverage counsel advised NUFIC's claims handler: "We heard from Cavell [OneBeacon's former claims administrator] early on that they plan to allocate the ongoing BI settlement payments over all primary coverage except the exhausted 1975-1976 policy, but we have never again discussed this issue with Cavell."  Likewise, on September 17, 2008, WPC's coverage counsel acknowledged in an email to all of the insurers:  "I may have compounded the confusion because I did not fully understand what information Resolute Management [OneBeacon's claims administrator] maintains in its internal records . . . Resolute Management maintains a system for allocating settlement payments over the periods of alleged exposure."  Later, on July 8, 2009,

WPC's coverage counsel was copied on an email exchange in which Federal's adjuster inquired: "What are the total underlying limits and policy period? Is there erosion across any other policy year or has all loss been allocated to the 1976-77 and 1977-78 periods?" to which OneBeacon's adjuster responded: "No, there is total erosion to all policy years involved based on the alleged exposure to the settled plaintiffs." All of this was consistent with subsequent emails in 2011 between OneBeacon and WPC directly confirming pro rata horizontal allocation. WPC also was receiving regular reports from OneBeacon regarding payment of settlements from which the manner of allocation was readily apparent. WPC simply refused to exercise any rights it may have had under *Goodyear*.

Indeed, rather than indicating any concealment by OneBeacon, the evidence actually suggests that WPC deliberately avoided tracking primary-layer erosion, or at the very least failed to take reasonable steps to determine whether or not it agreed with the manner in which OneBeacon was allocating payments. For example, on October 24, 2006, WPC's coverage counsel advised WPC and OneBeacon that he wanted other insurers to "evaluate for themselves the possibility that Cavell will reach the limits of its primary PL insurance." On April 7, 2008, WPC's coverage counsel informed Great American's adjuster that "there is no explicit list of impaired limits by policy period." Likewise, on July 15, 2009, WPC's coverage counsel informed Federal's adjuster: "Our chart can tell you the original policy limits, but for now you must assemble yourself the list of impaired limits . . . we cannot yet collect that data to show impairments." Later that year, when asked about impairment of primary coverage, WPC's coverage counsel informed the same Federal adjuster: "Powell still does not maintain such records itself".

WPC and its other insurers continued their slumber until early 2008 when the *Walton* case resulted in a $5.66 million verdict against WPC in California. The verdict made clear that there

–6–

was a potential for verdicts that could implicate the excess insurers' policies.  This led to a host of inquiries from the other insurers demanding to know about the erosion of WPC's primary policies after six years and thousands of paid asbestos claims.  Unfortunately, WPC's failure to independently track such erosion caused its coverage counsel to incorrectly advise the other insurers that OneBeacon had not done so either and that over $19 million of primary limits still remained.  When OneBeacon responded that this was incorrect, WPC's coverage counsel acknowledged his mistake and advised the other insurers that WPC did not track such information but vowed to work with OneBeacon to get the insurers the information they were requesting.  The result was a much more robust interaction between OneBeacon and WPC regarding the tracking of primary layer erosion.

The foregoing events surrounding the *Walton* case highlighted an important difference between the priorities and responsibilities of WPC and OneBeacon.  OneBeacon is a publicly regulated insurer which has a responsibility to track payments by policy as they are made. Protecting the public from insurer insolvency is an important part of the regulatory framework governing all insurers (as WPC should be painfully aware as a result of Reliance's insolvency which wiped out millions of dollars of insurance for WPC's Asbestos Claims).  See *Taylor v. Ernst & Young, LLP*, 130 Ohio St.3d 411, 2011-Ohio-5262, ¶¶ 10-12 (describing regulatory framework to protect insurers from insolvency); *The William Powell Co. v. Nat'l. Indemn. Co.*, 141 F.Supp.3d 773 (S.D. Ohio 2015) (dismissing WPC's RICO claims against OneBeacon's claims administrator and reinsurer base upon Ohio's regulatory framework).  Accordingly, OneBeacon kept careful track of policy erosion.  WPC, on the other hand, did little to track erosion—despite its obvious self-interest in doing so.  Even as late as May 7, 2013, WPC's corporate deponent on the issue of allocation admitted that WPC had failed to keep careful track of policy erosion.  Instead, WPC

allowed OneBeacon to pay tens of millions of dollars in payments under a well-known, horizontal allocation framework and then argued for retroactive reallocation of such payments in any way WPC wanted. However, retroactive reallocation of such payments years or decades after the fact undermines the important regulatory protection of the public and consequently should not be countenanced.

WPC's conduct demonstrates the harm that can result from allowing an insured to sit on its rights for years without ever taking a firm position. For instance, rather than exercise any rights it might have under *Goodyear* to direct allocation, on July 28, 2011, WPC instead demanded defense and indemnity of WPC's Asbestos Claims from Federal Insurance Company ("Federal") under Policy No. 7932-95-55 issued by Federal to WPC, effective August 26, 1976 to July 26, 1977 ("Federal Policy") on the basis that the OneBeacon primary policies from 1969 forward were exhausted. Pursuant to WPC's demand, Federal paid WPC $474,843.50 in indemnity payments. Thereafter, on March 5, 2013, WPC's coverage counsel unilaterally announced to all of WPC's defense counsel that they were to include Federal on all communications related to defense and settlement of claims with dates of first exposure ("DOFE") between 1969 and 1976. However, on August 29, 2013, in a complete about-face, WPC unilaterally announced that the Federal Policy was *not* triggered after all. Accordingly, on October 17, 2013 WPC instructed defense counsel to stop communicating with Federal. When Federal understandably demanded its money back from WPC, WPC refused to return it. As a result, Federal filed Federal's Counterclaim against WPC and OneBeacon seeking the $474,843.50 that Federal had paid to WPC. In short, WPC's failure to exercise any rights under *Goodyear*, or even to take a solid position on allocation, as late as 2011 caused Federal to sue OneBeacon.

In 2002, WPC advised OneBeacon of WPC's desire to incorporate *Goodyear* into a

–8–

"protocol" to address handling of WPC's Asbestos Claims.  Nevertheless, it is undisputed that

WPC refused to make a selection as to which policies might be targeted under *Goodyear* until late

2017—even when asked in discovery in 2012 to do so.  This remained true even after WPC's

allocation claim was previously set for trial—*twice*.  As the second trial approached, rather than

making a *Goodyear* selection WPC actually disclaimed having any allocation rights[2]--whereupon

this Court dismissed WPC's allocation as non-justiciable.[3]  This Court can take judicial notice of

its own docket for the fact that from 2011 until 2016 WPC's coverage attorneys aggressively

pursued WPC's allocation claim against OneBeacon only to give it up when trial was imminent.[4]

 OneBeacon incurred at least $24,660 in legal fees and expenses that it would not have had to incur

if WPC had simply exercised any of the rights it claimed to have under *Goodyear*.  There is no

question that WPC premised this entire litigation on its assertion that it has the right to direct

allocation, only to then renounce any such rights on the eve of trial in order to avoid a trial.

   In 2014, WPC launched yet another allocation-related front against OneBeacon when it

filed *The William Powell Company v. Nat'l. Indemnity Co.*, No. 1:14-cv-00807, in the United

States District Court for the Southern District of Ohio, accusing OneBeacon and its claim

administrator and reinsurer of, among other things, being a criminal enterprise "conspiring to erode

---

[2] (WPC's Motion for Summary Judgment [filed December 21, 2015], p. 12)("[A]s this case currently stands, it is legally impossible for Powell to have waived or be precluded from exercising its *Goodyear* rights because it does not yet have such rights. Although the Court has ruled on the parties' respective 2013 motions for summary judgment, OneBeacon intends to appeal and thus maintains that there is an ongoing dispute as to what constitutes the pool of triggered policies. And [sic] because there is no determination of which policies are triggered […] allocation cannot yet have taken place and **Powell has no right yet to make an allocation decision** (although it will in the future). […]").

[3] (February 5, 2016 Summary Judgment Order).

[4] Or for a more focused analysis, see OneBeacons' Motion for Sanctions (filed March 7, 2016) and related briefs.

coverage" and undertaking a "scheme to curtail, reduce, and exhaust Powell's policy limits" ("Federal Litigation"). WPC alleged that "Powell had been assured by defendant OneBeacon's representative that 'its coverage would never exhaust'". Of course, such allegations are inexplicable based upon the foregoing evidence about WPC's long-standing knowledge about its insurance policies and OneBeacon's allocation method. Fortunately, the federal district court dismissed WPC's RICO claims—leaving only garden variety breach of contract and bad faith allegations against OneBeacon on less than 1% of the 26,000 claims handled by OneBeacon over the past 16 years. Of course, premature erosion of coverage or "schemes" to "curtail, reduce, and exhaust Powell's policy limits" should have been easy to thwart if WPC had simply exercised any *Goodyear* rights it had within a reasonable period of time. At the very least, the issue could have been brought to a head and resolved well before today. Instead, OneBeacon has incurred over $500,000 in legal fees (and counting) with respect to the Federal Litigation—all because WPC sat on any allocation rights it had.

When WPC's allocation claim was dismissed by this Court in 2016, it was the last remaining claim by WPC against OneBeacon. The only remaining claims against OneBeacon in this case were those filed by Federal as a result of WPC's acts and omissions. Federal's claims were the only claims subject to the August 27, 2018 trial date. When WPC was permitted to file new allocation claims against OneBeacon, OneBeacon and the other insurers joined as Third-Party Defendants were given just a little over 90 days to prepare an $80 million case involving over 30 years of records for trial—all in the name of WPC being able to have a trial on *Goodyear* rights that WPC had disclaimed in 2016 to avoid an earlier trial.

As pointed out above, by the time that WPC brought its new allocation claims in 2018, allocation for OneBeacon's primary policies had become moot. The amounts paid by OneBeacon

have far exceed the combined limits of OneBeacon's primary policies—no matter how the payments are allocated.  The sole remaining issue on allocation between WPC and OneBeacon is whether OneBeacon's excess policies are presently triggered such that WPC may presently allocate any amounts to OneBeacon's excess policies?  If not, then WPC's allocation claim is not justiciable—OneBeacon's primary policies are exhausted and OneBeacon's excess policies are not triggered.  If OneBeacon's excess policies are presently triggered, then this Court must decide whether WPC's acts or omissions otherwise bar it from allocating any monies to OneBeacon's excess policies.

OneBeacon reserves all other rights and claims for trial.

## III.    Law & Argument

### A.    WPC cannot allocate payments to OneBeacon's excess policies because OneBeacon's excess policies are not presently triggered by WPC's Asbestos Claims.

#### 1.    Under *Goodyear*, allocation can only be made to triggered policies.

As previously stated, under *Goodyear*, WPC is only "permitted to choose, from a pool of ***triggered*** primary policies, a single primary policy against which it desires to make a claim.  In the event that this policy does not cover [WPC's] entire claim, then [WPC] may pursue coverage under other primary or excess insurance policies."  2002-Ohio-2842, at ¶12 (Emphasis added).  Accordingly, allocation can only take place ***after*** ***it is determined which policies are triggered***.  *Id.*, at ¶6 ("This 'all sums' approach allows [WPC] to seek full coverage for its claims from any single policy, up to that policy's coverage limits, out of the group of policies ***that has been triggered***")(Emphasis added). *See also Pa. Gen.*, 2010-Ohio-2745, at ¶¶11-12.

Under *Goodyear*, trigger is determined by policy language.  *Goodyear*, 2002-Ohio-2842, ¶12 (explaining that court could not determine whether excess insurance could be triggered

–11–

because "the question of what insurance may be tapped next is dependent upon the terms of the particular policy"). Thus, while "vertical exhaustion" (ie. the ability of the insured to select a given year in which to allocate first to the primary policies and then to the excess policies in that year) is an abstract possibility, it can only occur if each selected policy is actually triggered, according to the policy language, by the loss or losses for which the insured seeks coverage.

**2.      The OneBeacon excess policies are not yet triggered because there remains underlying insurance that is unexhausted.**

OneBeacon's excess policies each provide, in pertinent part:

> The company shall not be required to defend such suits or make investigation or settlement of claims or pay such expenses. . . if coverage is provided for such defense, settlement and supplementary expenses under the terms of any underlying policy required to be maintained by the insured (whether or not such policy is in fact maintained) ***or under any other underlying insurance collectible by the insured*** . . .
>
> * * *
>
> With respect to bodily injury . . . the company's liability shall be only for the ultimate net loss in excess of the insured's retained limits defined as the greater of . . . the total of the applicable limits of liability of the underlying insurance as set forth in Schedule A hereof, ***plus the applicable limits of any other underlying insurance collectible by the insured*** . . .
>
> * * *
>
> When used in this policy (including endorsements forming a part hereof):
>
> * * *
>
> "underlying insurance." ***If collectible insurance with any other insurer is available to the insured covering a loss also covered hereunder, such insurance shall be deemed "underlying insurance,"*** provided, however, this does not apply to insurance which is written as excess insurance over the limits provided by this policy. (emphasis added).[5]

---

[5] Policy No. XC 5424 does not include the definition of "underlying insurance".

–12–

This language provides that the OneBeacon excess policies are not triggered unless and until the limits of all collectible "underlying insurance" applicable to the occurrence have been exhausted. "Underlying insurance" is expressly defined to mean any "collectible insurance with any other insurer . . . available to the insured covering a loss also covered hereunder" except " insurance which is written as excess insurance over the limits provided by this policy." [6]

Clearly, this would apply to the three remaining OneBeacon primary policies under WPC's proposed allocation (1970-1971, 1975-1976 and 1976-1977) as they are not only underlying insurance, but also are specifically scheduled underlying insurance. Accordingly, the $4,269,247 WPC has proposed be allocated to OneBeacon's excess policies must first be reallocated to exhaust the remaining OneBeacon primary policy years of 1970-1971, 1975-1976 and 1976-1977 to give effect to this compulsory language in the OneBeacon excess policies. However, this only addresses $932,229, which applies to exhaust the remaining limits of the OneBeacon primary policies. Thus, under WPC's proposed allocation, a balance of $3,337,238 remains once the OneBeacon primary policies are exhausted. This $3,337,238 must all be allocated to the NUFIC Policy because, according to the language of the OneBeacon excess policies, the NUFIC Policy constitutes "underlying insurance" that must be exhausted before any of OneBeacon excess policies are triggered. This inexorable conclusion stems directly from the interaction of the policy language in the OneBeacon excess policies and the NUFIC Policy—which is exactly where the Supreme Court of Ohio has directed this Court to look in such matters. *Goodyear*, 2002-Ohio-2842, ¶12 ("The answer to the question of what insurance may be tapped next is dependent upon the terms of the particular polic[ies]" that the insured seeks to trigger).

---

[6] The definition is clear enough and broad enough to encompass all other insurance at or below the level of the OneBeacon excess policies.

–13–

In this regard, the insuring agreement in the NUFIC Policy provides, in pertinent part:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:

> A. bodily injury . . .

> * * *

> to which this insurance applies, caused by an occurrence, if the bodily injury . . . is included within the . . . the products hazard and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury . . . even if any of the allegations of the suit are groundless, false or fraudulent . . .

This language is virtually identical to the language in two preceding OneBeacon primary policies that WPC concedes are triggered by WPC's Asbestos Claims. There are no applicable exclusions. Moreover, the NUFIC Policy includes an "other insurance" clause which expressly states that ***it is primary as compared to all other insurance***:

> **6. Other Insurance.** The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under this policy shall not be reduced by the existence of other insurance.

Collectively, this policy language requires NUFIC to provide first-dollar defense for WPC's Asbestos Claims because an insurer using such policy language must defend its insured against any ***potentially*** covered claim—even if there is no ultimate duty to indemnify. *City of Willoughby Hills v. Cincinnati Ins. Co.*, 9 Ohio St.3d 177, 180, 459 N.E.2d 555 (1984).[7] Based upon the foregoing, the OneBeacon excess policies are excess to the NUFIC Policy for claims that are triggered under both policies.

---

[7] Through discovery, OneBeacon understands that there may be collateral agreements between NUFIC and WPC that may shift the cost of defense to WPC, but such agreements are immaterial to the prioritization of coverage between the OneBeacon excess policies and the NUFIC Policy.

–14–

The recent decision in *First State Ins. Co. v. ACE Prop. and Cas. Co.*, Case No. 2016 CV 00697, Montgomery County, Ohio CCP (September 13, 2017) is directly on point and adverse to WPC's arguments. There, First State's policy was excess to an "underlying limit," defined as the amount of scheduled underlying insurance "plus the applicable limits of other underlying insurance collectible by the insured." The court held that this language required horizontal exhaustion of underlying insurance, and that all collectible primary insurance had to be exhausted before First State's excess insurance was triggered:

> Thus, First State is limited to paying the amount of ultimate net loss contained within the definition of 'underlying limit.' The underlying limit is clearly in excess of the immediate underlying insurance listed in the schedule as well as any other insurance collectible by the insured.
>
> This is supported by the 'other insurance' clause contained within the policy. This clause clearly states that First State is not liable for losses if other collectible insurance is available covering a loss covered by the policy unless the insurance was bought specifically to be in excess of First State's policy. Further, in the 'Limits of Liability' clause, the policy clearly contemplates, primary insurance policies which may be in place prior to the inception of the policy as well as those policies which may take place after the inception of the First State policy.
>
> Thus, First State's policy requires horizontal exhaustion and all primary insurance carriers implicated in the underlying asbestos claims must exhaust their applicable policy limits before First State's duties under their policy attaches.

Not surprisingly, other courts in similar circumstances have determined priority of coverage consistent with the foregoing. See *Castronovo v. NUFIC*, 571 F.3d 667 (7th Cir. 2009)(applying Ohio law to hold that NUFIC's excess policy was not triggered where remaining underlying insurance was not exhausted and NUFIC's excess policy was not triggered unless "any other underlying insurance providing coverage to the Insured have been exhausted"); *Federal-Mogul U.S. Asbestos Personal Injury Trust v. Cont'l. Cas. Co.*, 666 F.3d 384, 388-391 (6th Cir. 2011) (relying upon *Castronovo* to hold that excess insurer with similar policy language was not

–15–

required to provide coverage for asbestos claims until all potentially applicable underlying insurance was exhausted).[8] Such holdings are consistent with Ohio law that excess insurers do not "drop down" to provide coverage below agreed amounts unless they have expressly contracted to do so. *Revco D.S., Inc., v. Gov't. Employees Ins. Co.*, 791 F.Supp.1254, 1264-1268 (N.D. Ohio 1991), *aff'd by* 984 F.2d 154 (6th Cir. 1992); *Wurth v. Ideal Mut. Ins. Co.*, 34 Ohio App.3d 325, 328-331, 518 N.E.2d 607 (12th Dist. 1987); *Value City, Inc. v. Integrity Ins. Co.*, 30 Ohio App.3d 274, 275-279, 508 N.E.2d 184 (10th Dist. 1986).

Moreover, it is well-established that excess policies are not required to provide coverage until primary policies with self-insured retentions are fully exhausted because to do otherwise would "obliterate[] the distinction between primary and excess insurance." *Padilla Constr. Co., Inc. v. Transportation Ins. Co.*, 150 Cal.App.4th 984, 1003, 58 Cal.Rptr.3d 807 (2007); *Pacific Coast Bldg. Products, Inc., v. AIU Ins. Co.*, 300 Fed. Appx. 546, 549 (9th Cir. 2008); *Missouri Pacific RR Co. v. Int'l. Ins. Co.*, 288 Ill. App.3d 69, 80-82, 679 N.E.2d 801 (1997); *Lamorak Ins. Co. v. Kone, Inc.*, 2018 IL App (1st) 163398 (2018), ¶28.[9] As the Twelfth Appellate District stated

---

[8] WPC argues that *Goodrich Corp. v. Commercial Union Ins. Co.*, 9th Dist Nos. 23585, 23586, 2008-Ohio-3200 (and a federal district court case that relies upon *Goodrich*) mandate a different result. (WPC's MSJ, p. 23). However, *Goodrich* was decided on the basis that the excess insurers were not entitled "settlement credits" because they failed to prove that the primary insurers paid the same damages as those imposed against the excess insurers. No such issue exists in this case. Accordingly, *Goodrich* is of no help to WPC's argument.

[9] This conclusion is supported by the premium comparison analysis advanced by WPC and endorsed by the First Appellate District in this case. See *William Powell Co. v. OneBeacon Ins. Co.*, 1st Dist. No. C-160291, 2016-Ohio-8124, ¶¶38-39; see also Lamorak, ¶28. The premium for the last OneBeacon primary policy (76-77) which provided $1M in limits was $355,000 (Stipulation of Facts, Bates No. POWELL00022525). The premium for the NUFIC Policy issued a year later with limits of $750,000 excess of a $250K SIR was $125,000. (Ex. 4, Bates No. OBO0058). **The combined premiums for all of OneBeacon's excess policies** containing limits of $5M per year over seven years was only $30,000—less than a fourth of the cost of the NUFIC Policy. (Stipulation of Facts, Bates No. POWELL00022549, POWELL00022606, POWELL00022659). Based upon this comparison, there is no reasonable basis to contend that

–16–

in *Wurth*: "It seems to us, by definition and longstanding principle, that an excess insurer is not generally liable for any part of the loss or damage which is covered by other insurance (be it collectible or uncollectible), but is liable only for the amount of loss or damage in excess of the coverage provided by all other applicable insurance policies." 34 Ohio App.3d at 328.

Moreover, prioritization of coverage—or the determination of whether insurance is primary, excess, underlying or otherwise—is never determined in the abstract, it is always determined in comparison to other insurance. The NUFIC Policy's "other insurance" clause declares that the NUFIC Policy is primary as to all other insurance. The OneBeacon excess policies declare that they are excess to all other "collectible insurance. . . available to the insured covering a loss also covered hereunder" which is not "written as excess insurance over the limits provided by" the OneBeacon excess policies. Under such circumstances, both the Supreme Court of Ohio and the First Appellate District hold that the interaction between these clauses render the NUFIC Policy as underlying to the OneBeacon excess policies. See *Motorists Mut. Ins. Co. v. The Lumbermens Mut. Ins. Co.*, 1 Ohio St.2d 105, 205 N.E.2d 67 (1965), at syllabus (excess other insurance clause given effect over primary other insurance clause); *Wildeboer v. State Auto. Mut. Ins. Co.*, 1st Dist. No. C-790296, 1980 WL 352870, *2 (same); *Oblinger v. State Auto Ins. Cos.*, 163 Ohio App.3d 266, 2005-Ohio-4695, ¶¶43-44 (1st Dist.) (same); see also *U.S. Gypsum Co. v. Admiral Ins. Co.*, 268 Ill.App.3d 598, 654, 643 N.E.2d 1226 (1994) (holding that comparison between other insurance clauses prohibited insured from seeking coverage from excess policies while full fronting policy remained unexhausted).

Although this is the only reasonable and fair interpretation of the interaction between the

---

the parties contemplated the risk covered by the OneBeacon excess policies was similar to the risk covered by the NUFIC Policy.

−17−

OneBeacon excess policies and NUFIC policies, WPC now contends that the NUFIC Policy should not be treated as "underlying insurance" to the OneBeacon excess policies. However, for the reasons that follow, WPC's arguments fail.

First, not only do the foregoing policy provisions render the NUFIC Policy primary coverage, but for most of the last two decades, ***both WPC and NUFIC have acknowledged the NUFIC Policy provides "primary" coverage for WPC's Asbestos Claims***. In this regard:

- In 2002, WPC circulated the foregoing coverage chart that depicted the NUFIC Policy as primary coverage and also expressly identified as the NUFIC Policy as "primary".

- On July 10, 2002, in response to WPC's circulation of the foregoing chart, NUFIC responded that WPC's chart "shows that [NUFIC] issued a ***primary*** policy to [WPC] for the period of 7/26/77-7/26/79" (emphasis added). WPC's coverage counsel responded by differentiating the NUFIC Policy from WPC's excess policies: "The umbrella carriers have been asking whether [NUFIC] has paid any claims under this policy that would make more likely reaching their levels."

- On March 11, 2008, NUFIC advised WPC that the NUFIC Policy "provided ***primary*** coverage to William Powell Co. during the 1977-79 policy periods" (emphasis added).

- On July 15, 2009, WPC advised Federal that NUFIC "had ***primary*** PL coverage for 1977-78 and 1978-79" (emphasis added).

- in 2012, WPC admitted in discovery: "Powell admits that this National Union Policy may potentially provide ***primary*** insurance coverage" for WPC's Asbestos Claims. (emphasis added).

- in 2013, WPC's 30(B)(5) deponent on allocation confirmed the foregoing response and then testified: "Q. Is it your position, William Powell's position, that [the NUFIC Policy] provides coverage for these asbestos claims? A. It's my understanding that it provides coverage after the self-insured retention has been paid."

Accordingly, WPC and NUFIC have publicly conducted themselves for many years in a manner that is consistent with the NUFIC Policy being "primary" insurance. Such evidence is particularly probative of the actual relationship between policies. See *William Powell Co.*, 2016-Ohio-8124,

–18–

¶¶33-38 (First Appellate District examining extrinsic evidence in this case to determine whether OneBeacon's pre-1965 policies have annualized aggregate limits); *Lamorak Ins. Co. v. Kone, Inc.*, 2018 IL App (1st) 163398 (2018), ¶¶35-36 (examining similar documents to help determine that policy with self-insured retention constituted primary rather than excess insurance).

Second, WPC's argument that the NUFIC Policy does not constitute "collectible" underlying insurance to the OneBeacon excess policies is contrary to controlling legal authority. The First Appellate District has held that "valid and collectible insurance" is "that which is legally valid and issued by a solvent company." *Wildeboer v. State Auto. Mut. Ins. Co.*, 1st Dist. No. C-790296, 1980 WL 352870, at *2. In *Wurth*, the Twelfth Appellate District held likewise when examining the effect of the following provision of an excess policy:

> The insurance afforded by this policy shall be excess insurance over any other valid and collectible insurance (except when purchased specifically to apply in excess of this insurance) available to the insured, whether or not described in the Schedule of Underlying Insurance Policies, and applicable to any party of the ultimate net loss, whether such other insurance is stated to be primary, contributing, excess or contingent . . .

34 Ohio App.3d at 328-329. Citing cases from across the country, the Twelfth Appellate District explained the effect of the clause as follows:

> As we read Condition 8, "collectible" does not refer to the actual payment of a sum of money, but instead refers to the existence of other applicable insurance coverage based on the occurrence in question. Whether payment of other applicable and available insurance (be it primary, contributing, excess or contingent) actually takes place is not the focus of inquiry under the paragraph in question. Instead, the focus is on the existence of such applicable and available insurance. [citations omitted]

> Whatever confusion the use of the word "collectible" in paragraph 8 creates, it cannot overcome the paragraph's attendant declaration that it is "excess" liability coverage for amounts "over," i.e. above, beyond, greater than, or exceeding, any other available and applicable insurance except such insurance as is specifically purchased to be in excess of Twin City's excess policy.

–19–

34 Ohio App.3d at 330. As the NUFIC Policy is legally valid and issued by a solvent company, the NUFIC Policy constitutes "underlying insurance," as defined in the OneBeacon excess policies, because it is "collectible insurance. . . available to the insured covering a loss also covered hereunder" which is not "written as excess insurance over the limits provided by" the OneBeacon excess policies.

That the NUFIC Policy may be subject to a $250K SIR does not change the fact that it constitutes "underlying insurance" to the OneBeacon excess policies. WPC cites no legal authority for its position on this issue, and its argument runs counter the foregoing principles and other Ohio cases. For instance, in *Williamson v. Walles*, 6th Dist. No. L-08-1010, 2009-Ohio-1117, the tortfeasor injured the plaintiff in an automobile accident. The tortfeasor had personal automobile liability coverage with Farm Bureau General Insurance Company of Michigan ("Farm Bureau") limits of $300,000 per person/$300,000 per accident. However, because the tortfeasor was in the course and scope of employment, he also had automobile liability coverage through his employer's policy, Lexington Insurance Company ("Lexington"), that was subject to a $250K SIR (just as the NUFIC Policy in this case). 2009-Ohio-1117, ¶¶2-32.

As plaintiff's damages were substantial, the tortfeasor, his employer, Farm Bureau and Lexington all filed cross motions for summary judgment regarding who should bear responsibility for the damages. Based upon the other insurance clauses in the respective policies, the trial court held: Farm Bureau must provide the first $300,000; then the employer must pay the $250K SIR in the Lexington policy; then Lexington's insurance was triggered for amounts over $550,000. 2009-Ohio-1117, ¶4. Following the ruling, settlements and procedural wrangling ensued and resulted in an appeal. 2009-Ohio-1117, ¶¶5-6.

On appeal, the tortfeasor and Farm Bureau argued that Lexington should "drop down" to

–20–

pro rate with Farm Bureau and close the SIR gap. The Sixth Appellate District unanimously rejected this argument and affirmed. Addressing Lexington's obligations, the court of appeals explained, in pertinent part:

> [A]ppellants argue that Lexington's policy should "drop-down" and provide a prorated share of coverage with Farm Bureau for the initial $250,000 of coverage . . . We disagree . . . Lexington only affords coverage that is excess to other available insurance, such as Farm Bureau.
>
> . . . Lexington's policy further states that "[i]f collectible insurance with any insurer is available to the Insured covering a loss also covered hereunder, the insurance hereunder shall be in excess of, and not contribute with, such other insurance provided * * *." Because Farm Bureau provided collectible insurance up to $300,000, at best, Lexington's policy only provided excess coverage over that amount.

2009-Ohio-1117, at ¶¶31-32.

While the posture of the $250K SIR in *Williamson* is different than this case (it was in the excess policy instead of the other primary policy), the principle and the ensuing result are the same. The $250K SIR did not change the excess-primary relationship between the two insurers, and the insured remained responsible for the $250K SIR under all scenarios. The result should be the same in this case based upon a comparison between the express language in the OneBeacon excess policies and the NUFIC Policy. See *Lamorak*, ¶¶27-38 (finding that policy with SIR constituted primary insurance before umbrella policies could be reached); *U.S. Gypsum Co.*, 268 Ill.App.3d at 654 (finding that full fronting policy [under which insured retained all risk] constituted primary insurance before excess policies could be reached). Even if WPC were ultimately freed from any obligation under its $250K SIR, it would not change the relationship between the OneBeacon excess policies and the NUFIC Policy. The NUFIC would remain as unexhausted "underlying insurance" thereby precluding the OneBeacon excess policies from being triggered.

**3. The 1972-1975 and 1975-1976 OneBeacon excess policies are not triggered because WPC's Asbestos Claims are barred by pollution exclusions.**

The 1972-1976 and 1975-1976 OneBeacon excess policies each include a pollution exclusion that states, in pertinent part:

> It is agreed that the insurance does not apply to bodily injury . . . arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or irritants, contaminants or pollutants into . . . the atmosphere . . . but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

It is beyond dispute that asbestos bodily injury claims, such as WPC's Asbestos Claims, result from the inhalation of asbestos fibers suspended in the air. *Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1038 (D.C. Cir. 1981); *INA v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1214-1215 (6th Cir. 1980).

Such facts caused the First Appellate District to hold that a similar pollution exclusion barred claims for asbestos bodily injury claims in *Selm v. Am. States Ins. Co.*, 1st Dist. No. C-010057, 2001 Ohio WL 1103509. In *Selm*, *3-4, citing cases from around the country, the First Appellate District explained: "There is no doubt that asbestos is an irritant or contaminant, and therefore a pollutant under the policy . . . We hold that the pollution-exclusion clause in the American States policy unambiguously precluded coverage for the release of asbestos-containing material by Dangle's use of a sander on the vinyl flooring."

WPC raises three objections to the application of *Selm* in this case.

First, WPC argues that that OneBeacon "waived" its right to rely upon the pollution exclusions in its excess policies. However, it is undisputed that the pollution exclusions are clearly laid out in the excess policies and when OneBeacon started making payments under its excess policies it did so under a reservation of rights that specifically stated:

> OneBeacon's investigation of the captioned matter is not and should not be
> construed as an admission of coverage under any of the foregoing policies,
> a waiver of any misrepresentations or breach of warranty, a waiver of any
> violations of applicable law or public policy, a waiver of any Declarations,
> Insuring Agreements, **Exclusions**, Definitions, Special Provisions, General
> Conditions and/or Endorsements any of the foregoing policies, or a waiver
> of any rights which OneBeacon may have with respect to the captioned
> matter. Rather, OneBeacon reserves all rights with respect to the captioned
> matter . . . (emphasis added).

The purpose of OneBeacon's reservation of rights is well-established under Ohio law—it was to

protect OneBeacon from arguments that its conduct in the handling of WPC's asbestos liability

could waive or estop OneBeacon from asserting its rights under the OneBeacon policies. *See*

*Motorists Mut. Ins. Co. v. Trainor*, 33 Ohio St.2d 41, 294 N.E.2d 874 (1973) (an insurer may

defend its insured under reservation of rights without waiving its contractual rights); 7cf-196

Appleman on Insurance §496 (2013) (recognizing near universal agreement that an insurer

conducting defense under reservation of rights is not estopped from subsequently asserting

coverage defenses). Accordingly, there is no waiver in this case.

Second, WPC asserts that the pollution exclusion in *Selm* is differently worded than the

pollution exclusion in the OneBeacon excess policies. This is true, but it is immaterial. Under

*Selm*, the definition of "pollutant" is virtually identical to the OneBeacon excess policies. Asbestos

is a pollutant under this definition. It is beyond dispute that WPC's Asbestos Claims were caused

by release of asbestos into the atmosphere which allowed it to be inhaled by the claimants.

Accordingly, *Selm* remains applicable.

Finally, WPC argues that other Ohio courts have reached different conclusions than *Selm*.

This is true also, but also immaterial. There is no question that there are other cases in Ohio that

hold otherwise. See *Citizens Ins. v. Lanly Co.*, Nos. 1:07 CV241, 1:07 CV 467, 1:07 CV 469,

2007 WL 3129783 (N.D. Ohio Oct. 23, 2007), at *1-5 (characterizing *Selm*'s holding that

"asbestos is a pollutant for purposes of a pollution-exclusion clause" and finding it to be "on point and potentially dispositive," but declining to exercise declaratory jurisdiction because state courts should be left to resolve any conflict in the law). However, *Selm* is controlling on this Court. WPC cannot complain about this as WPC chose this forum in which to litigate because of other First Appellate District authority that it viewed as beneficial to its arguments. Accordingly, this Court should follow the well-reasoned decision in *Selm* and WPC can argue to the First Appellate District why *Selm* should be changed.

**B. WPC's allocation claim fails because: (1) OneBeacon's excess policies are not triggered; and (2) OneBeacon's primary policies are fully exhausted rendering primary allocation moot.**

Under WPC's own allocation model, OneBeacon has paid $21,667,770 in indemnity under its primary policies and $4,269,467 in indemnity under its excess policies—for a total of $25,937,237 in indemnity.

Based upon the foregoing, OneBeacon's excess policies are not triggered. Because they are not triggered, WPC cannot allocate defense and indemnity payments to them. Period.

Because the OneBeacon excess policies are not triggered, the $4,269,467 in indemnity paid thereunder must be reallocated to any primary policies that are available. Based upon WPC's own coverage chart there are only two potential primary insurers remaining: (1) three OneBeacon policies (70-71, 75-76 and 76-77) with remaining limits of $932,229; and (2) the NUFIC Policy.

If $932,229 is first applied to exhaust the remaining primary policies, this renders any further allocation under the OneBeacon primary policies moot. There is nothing left to which allocation can be done. WPC's allocation claim with respect to all of OneBeacon's policies should be dismissed as moot.

The remaining $3,337,238 should be reallocated from the untriggered OneBeacon excess

policies to the NUFIC Policy. This leaves open the question of contribution against the NUFIC Policy to be addressed at trial.

### C. Additional reasons that WPC's Allocation Claim is Without Merit

#### 1. WPC waived its allocation rights.

OneBeacon agrees with the law on waiver set forth at pp. 8-9 of WPC's MSJ. The undisputed facts prove that WPC waived any right it might have under *Goodyear* when it renounced those rights in 2015 to avoid trial as described above. To the extent that *Goodyear* has any application, it provided WPC with an immediate right to seek to control allocation. As early as 2002, WPC advised OneBeacon that at some point it may want to try and exercise any rights it may have under *Goodyear*. Despite knowing that OneBeacon was horizontally allocating, WPC did not track erosion, did not make a selection and, in 2015, with an allocation trial approaching WPC renounced its rights: "[A]s this case currently stands, it is legally impossible for Powell to have waived or be precluded from exercising its *Goodyear* rights because it does not yet have such rights . . . allocation cannot yet have taken place and **Powell has no right yet to make an allocation decision** (although it will in the future)." The renunciation is even clearer in light of the light of the First Appellate District's express admonition that allocation needed to be addressed before a final appealable order could be reached to address the coverage issues that WPC claimed precluded it from determining which policies were triggered. See *William Powell Co. v. OneBeacon Ins. Co.*, 1st Dist. No. C-130681, 2014-Ohio-3528. As a result, this Court correctly dismissed WPC's allocation claim. Facing a trial on allocation, WPC knowingly and intentionally relinquished any rights it might have on the matter with full knowledge that the First Appellate District had ordered WPC and OneBeacon to resolve this issue before addressing the coverage issues that concerned WPC.

–25–

Moreover, WPC's attempt to retroactively reallocate tens of millions of dollars of defense and indemnity payments more than a decade after they were made is directly contrary to the plain import of the Ohio Supreme Court's decision in *Goodyear*. This is because *Goodyear* contemplates that the insured select a policy at the *outset* of a claim or lawsuit:

> For each site, Goodyear should be permitted to choose, from the pool of triggered primary policies, a single primary policy against which it desires to make a claim. In the event that this policy does not cover Goodyear's entire claim, then Goodyear may pursue coverage under other primary or excess insurance policies. The answer to the question of what insurance may be tapped next is dependent upon the terms of the particular policy that is put into effect by Goodyear.

*Goodyear,* 95 Ohio St. 3d at 517.

This is as it should be, for a lawsuit has to be defended from the outset, and defense and indemnity costs have to be paid from one or more particular insurance policies. In the highly-regulated insurance industry there can be no "general fund" out of which defense and indemnity payments can be made. So if the insured does not exercise its *Goodyear* allocation right at the outset, the insurer's *right* to defend dictates that it can handle a suit as it sees fit. Certainly, nothing in *Goodyear* contemplates an insured allowing an insurer to handle claims as it sees fit for over a decade – spending $80 million in the process – and then seek to reallocate these payments retroactively.

The OneBeacon policies provide that OneBeacon has "the right and duty to defend any suit against" WPC seeking covered damages. This language unequivocally gives the OneBeacon the right to control the defense of tendered claims seeking covered damages. *Pilkington N. AM., Inc. v. Travelers Cas. & Sur. Co.*, 112 Ohio St.3d 482, 2006-Ohio-6551, at ¶34; *Chiquita Brands Int'l, Inc. v. Nat'l. Union Fire Ins. Co. of Pittsburgh, PA*, 1st Dist. No. C-140492, 2015-Ohio-5477, at ¶11 ("The 'right and duty' to defend benefits both the insurer and the insured. The insured receives

–26–

a defense. The insurer has control over the defense and is in a position to mitigate its potential losses.") Likewise, OneBeacon is not responsible for pre-tender defense costs or settlements. See *Dover Lake Park, Inc. v. Scottsdale Ins*, 9th Dist. No. 21234, 2003-Ohio-3312, at ¶¶10-15; *Novak v. State Farm Ins. Co.*, 9th Dist. No. 009CA0029-M, 2009-Ohio-6952, at ¶¶13-15; *Western Res. Mut. Cas. Co. v. OK Café & Catering, Inc.*, 3rd Dist. No. 9-12-46, 2013-Ohio-3397, at ¶¶26-29; *MBE Collection, Inc. v. Westfield Cos., Inc.*, 8th Dist. No. 2002-Ohio-1789, at *4.

It is widely recognized that "tender" is an implied pre-condition of coverage in every liability insurance policy. Tender generally requires the insured to not only provide notice to the insurer, but also request that defense and indemnity be provided. See e.g. *Hartford Acc. & Indemn. Co. v. Gulf Ins. Co.*, 776 F.2d 1380, 1383 (7th Cir. 1985)("Mere knowledge that an insured is sued does not constitute tender of a claim. What is required is knowledge that that the suit is potentially within the policy's coverage coupled with knowledge that the insurer's assistance is desired"); *Goodstein v. Cont'l Cas. Co.*, 509 F.3d 1042, 1056 (9th Cir. 2007)("[T]he insured must affirmatively inform the insurer that its participation is desired"). *Kincaid v. Erie Ins. Co.*, 128 Ohio St.3d 322, 2010-Ohio-6036, at ¶11 (an insured has no right to sue for coverage "until the insured has presented a claim" and the insurer has denied the claim or failed to respond). There is no formality required. The insured simply needs to communicate its expectation that the insurer will defend and indemnify as provided by the insurance policy.

WPC's obligation to tender its allocation demand when a suit is filed is no different from its obligation to tender defense. Absent an allocation demand – and to this day WPC has never made one for a newly-tendered claim – OneBeacon can allocate a claim to whichever of its triggered policies it wishes. This is how claims work. And WPC is not prejudiced by this at all, as OneBeacon defended and settled WPC's asbestos claims and suits to the tune of $80 million. An

allocation demand is a condition precedent to WPC's allocation right, and WPC waived that right by not making a timely demand.

### 2. WPC's allocation claim is barred by laches.

To succeed on a defense of laches, OneBeacon must prove: (1) an unreasonable delay or lapse of time in asserting a right; (2) absence of an excuse for the delay; (3) knowledge, actual or constructive, of the injury or wrong; and (4) prejudice. *State ex rel. Duclos v. Hamilton Cty. Bd. of Elections*, 145 Ohio St.3d 254, 2016-Ohio-367, ¶13. OneBeacon has presented Civ. R. 56 evidence creating at least a genuine issue of material fact with respect to each element.

With respect to the first element, if WPC had any rights under *Goodyear*, they existed from the moment that payments started. That was sixteen years ago. Without question, this is a unreasonable delay or lapse of time in asserting any such rights.

With respect to the second element, WPC claims that it waited to exercise such rights because there were questions about the scope of coverage under the OneBeacon policies. However, such questions did not arise until nearly a decade after claims started being paid, and then only after OneBeacon's primary policies began to exhaust. Moreover, as explained below with respect to the fourth element, had WPC exercised its alleged rights earlier, then disputed coverage issues would have been addressed earlier and OneBeacon would not have paid nearly $5M under its excess policies. WPC has never offered any justification for such a delay.

With respect to the third element, it is undisputed that WPC claimed a right to make a *Goodyear* selection as early as 2002 but declined to do so—even when it knew that OneBeacon was allocating horizontally.

With respect to the last element, OneBeacon has been clearly prejudiced by the WPC's delay in seeking to assert any rights it had under *Goodyear*. Setting aside the millions of dollars

–28–

paid under OneBeacon's excess policies that would not have been paid if WPC had acted sooner, WPC acts and omissions also directly led to thousands of dollars of litigation costs incurred to defend against WPC's "premature" allocation claims from 2011 forward, potential liability under Federal's cross-claim for hundreds of thousands of dollars due to WPC's flip-flopping on allocation and hundreds of thousands of dollars in litigation costs defending against claims of premature policy erosion in the Federal Litigation. At the very least, there are genuine issues of material fact as to whether OneBeacon has been prejudiced by WPC's actions. Based upon the foregoing one can begin to understand why Judge Myers found there was a genuine issue of material fact on this issue in 2013 (but it is harder to understand why WPC has filed a ***third*** motion for summary judgment on this subject).

### 3. The $250K SIR in the NUFIC Policy does not preclude OneBeacon from seeking contribution against WPC

WPC asserted in its motion for summary judgment: "OneBeacon cannot shift any of the loss covered by the Primary Policies to the National Union Policy because the effect would be to shift the loss to Powell." This is untrue—both as to OneBeacon's primary policies and its excess policies.

The mistake WPC makes is in assuming that contribution arises from insurance law. It does not. Contribution arises in equity. Relying on well-established and venerable authorities from Ohio and across the country, contribution was explained by the Eighth Appellate District in *Pa. Gen. Ins. Co. v. Park-Ohio Industries, Inc.*, 179 Ohio App.3d 385, 2008-Ohio-5991, ¶21:

> The general rule of contribution is that "one who is compelled to pay or satisfy the whole to bear more than his or her just share of a common burden or obligation, upon which several persons are equally liable * * * is entitled to contribution from the others to obtain from them payment for their respective shares" . . . The doctrine "rests upon the broad principle of justice, that where one has discharged a debt or obligation which others were equally bound with him to discharge, and thus removed a common

−29−

burden, the others who have received a benefit out in conscience to refund to him a ratable portion. (citations omitted).

While *Pa. Gen.* involved insurance coverage contribution for an asbestos claim (and its holding was affirmed by the Supreme Court of Ohio. See 126 Ohio St.3d 98, 2010-Ohio-2745), it rested upon much broader principles of equity. WPC's argument that *Arkwright Mut. Ins. Co. v. Lexington Ins. Co.*, 1st Dist. No. C-990347, 2000 WL 1434164 (WPC's MSJ, p. 19) dictates a different result is misplaced. *Arkwright* simply held that for contribution to occur between insurers, the insurers must be concurrent or co-insurers. That is: The linchpin for establishing concurrent liability among coinsurers is a showing that the respective coverages apply to the same property, insure against the same risk, and protect the same interest of the same insured." *Arkwright*, at *1. *Arkwright* does not limit contribution to a cause of action between insurance companies.

If OneBeacon seeks contribution for defense and/or indemnity payments that were also owed under the NUFIC Policy SIR, then unquestionably such payments discharged a common obligation for OneBeacon and WPC and there is no equitable reason why the amounts should not be recoverable in contribution by OneBeacon. See *Williamson*, at ¶4 (holding that insured remained responsible for $250K SIR in apportionment fight between co-insurers).

WPC can hardly complain about this result. WPC is a multi-million company, represented by an army of lawyers and insurance brokers, that negotiated an insurance deal in 1977 to reduce its primary insurance premiums by more than half by accepting a $250K SIR as part of the NUFIC Policy. If, after exhaustion of the remainder of its primary coverage with OneBeacon, WPC is called upon to contribute under its SIR, no injustice is done. Particularly since WPC was the one that demanded that OneBeacon make the payments on its excess policies in the first place.

In any event, the "equitable" side of what WPC is arguing does not support WPC's

–30–

position. Having elected to purchase policies with self-insured retentions after purchasing excess policies that were only triggered when all applicable underlying insurance was exhausted, WPC should not now be heard to complain about the consequences of that decision. Likewise, WPC should not be able to avoid paying its fair share of its asbestos liabilities by manipulating its insurance coverage to avoid its self-insured periods, as it is attempting to do. The "all sums" approach that the Ohio Supreme Court adopted in *Goodyear* is just the first step in a two-step process. The Ohio Supreme Court further held in *Goodyear* that the targeted insurer may then seek contribution. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, ¶11 (recognizing that this two-step approach promotes economy for the insured while still permitting the selected insurer to seek contribution from other responsible parties).

In *United States Gypsum Co. v. Admiral Ins. Co.*, 268 Ill. App.3d 598, 643 N.E.2d 1226 (1994), Gypsum sought coverage for asbestos claims under 35 years of excess insurance policies. At issue was whether Gypsum had to exhaust all available primary coverage before seeking any excess coverage. Some of the primary coverage included fronting policies that effectively made Gypsum self-insured across several policy periods.

The court held that Gypsum was required to exhaust all applicable underlying coverage, including the fronting policies, before reaching any excess insurance. The court observed that Gypsum was attempting to manipulate its coverage to "avoid absorbing the cost resulting from its position as a self-insurer." *United States Gypsum*, 268 Ill. App.3d at 653, 205 Ill. Dec. 619, 643 N.E.2d 1226. The court refused to permit Gypsum to do so:

> Adopting Gypsum's position permitting vertical exhaustion' would allow Gypsum to effectively manipulate the source of its recovery, avoiding difficulties encountered as the result of its purchase of fronting insurance and the liquidation of some of its insurers. This would permit Gypsum to pursue coverage from certain excess insurers at the exclusion of others. Such a practice would blur the distinction between primary and excess insurance

–31–

(see *Illinois Emcasco Insurance Co.,* 139 Ill.App.3d at 133 [93 Ill.Dec. 666, 487 N.E.2d 110]), and would allow certain primary insurers to escape unscathed when they would otherwise bear the initial burden of providing indemnification. *United States Gypsum,* 268 Ill.App.3d at 654, 205 Ill.Dec. 619, 643 N.E.2d 1226.

268 Ill. App.3d at 654. As in *Gypsum,* WPC cannot evade its obligations under the NUFIC self-insured retention.

WPC asserts that doing so would undermine any rights it has under *Goodyear.* However, *Goodyear* was based express policy language. 2002-Ohio-2842, ¶¶7-9. The express language of six OneBeacon Policies--the 1955-1958, 1958-1960, 1960-1963, 1963-1965 and 1965-1968 OneBeacon Primary Policies, as well as the 1969-1972 OneBeacon Excess Policy—is different than the policy language in *Goodyear* by requiring the occurrence causing the bodily injury must happen ***within the policy period*** in order for the policy to be triggered. Such language, while less common than the language in *Goodyear*, has nonetheless been held valid and enforceable by the First Appellate District. *Davis v. Cincinnati Ins. Co.*, 1st Dist. No. C-76203, 1977 Ohio App. LEXIS 8339, at *6-10. While no Ohio court appears to have addressed allocation under such policy language, other courts hold that such language mandates pro rata allocation--as undertaken by OneBeacon over the years. See e.g. *Consolidated Edison Co. of N.Y., Inc. v. Allstate Ins. Co.*, 98 N.Y.2d 908, 774 N.E.2d 687, 693-695 (2002); *Olin Corp. v. INA*, 221 F.3d 307, 323-324 (2d Cir. 2000). WPC cannot demand from the OneBeacon policies what they do not provide, and six of them do not permit "all sums" allocation under *Goodyear*. When combined with the fact that WPC knowingly accepted horizontal allocation from OneBeacon for more than decade and expressly waived its allocation rights in 2015, it cannot now argue that *Goodyear* should bar contribution against the NUFIC SIR.

### D. OneBeacon is Entitled to Contribution from the Later-Settling Insurers

–32–

Third-Party Defendants Great American Insurance Company of New York, Hartford Accident and Indemnity Company, State Auto Mutual Insurance Company, United States Fire Insurance Company and National Union Fire Insurance Company of Pittsburgh, PA (the "Later-Settling Insurers") claim that their settlement with WPC bars OneBeacon's contribution claim. This position is predicated upon three federal court decisions (two district court decisions and one appellate court decision) predicting that Ohio law would not permit an insurer that pays more than its fair share (either by settlement or judgment) to seek equitable contribution from an insurer that settled with the insured earlier for less than its fair share. (See p. 5 of Later Settling Insurers' Motion for Summary Judgment citing *OneBeacon Am. Ins. Co. v. Am. Motorists Ins. Co.*, 679 F.3d 456 (6th Cir. 2012); *Bondex Int'l., Inc. v. Hartford Acc. & Fire Indemn. Co.*, No. 1:03-CV-01322, 2007 WL 40593 (N.D. Ohio Feb. 1, 2007); *Gencorp, Inc. v. AIU Ins. Co.*, No. 1:02-cv-01770, (N.D. Ohio July 23, 2003).

In each of these federal cases, an insurer that was either adjudged to be responsible for, or settled for, more than its fair share of the insured's liability was denied contribution against an earlier-settling insurer. In order to foster a public policy of encouraging settlements, the federal courts predicted that Ohio law would not allow the later-paying insurer to seek contribution from the earlier-settled insurer, but would deem the earlier-settling insurer's policy to be fully exhausted and thereby credit the later-settling insurer with the full limits of the earlier-settling insurer's policy to the extent payment was for the same loss. See *OneBeacon Am. Ins. Co.*, 679 F.3d at 463 (holding that settlement effectively exhausts earlier settling insurer's policy and later settling insurer is entitled to credit for settlement if for the same loss);[10] *GenCorp*, at 9 (holding that a

---

[10] In *OneBeacon*, the Sixth Circuit also purported to rely upon R. C. 2307.28 for the proposition that a settlement should be final and preclude a contribution claim. 679 F.3d at 463. However, R. C. 2307.28 is a statutory enactment applicable only to contribution between joint tortfeasors. Such

–33–

majority of jurisdiction across the country hold that "an insured may settle a claim for less than the amount maximally obtainable from the responsible party, but the insurer's obligation to pay the insured is the same as though the insured had received the maximally obtainable amount"). If the insured and the early-settled insurer settled for less than policy limits, then the insured bears the burden of the difference.[11] Thus, in this case, WPC can make any deal it wants with the Later-Settling Insurers, but OneBeacon gets a credit as though the Later-Settling Insurers' policies have been exhausted by payment. In this case, it is undisputed that credit is $124 million across the mid-level excess policies issued by the Later-Settling Insurers **_PLUS_** an unaggregated $1 million per occurrence under the 1977-1978 policy issued by National Union Fire Insurance Company of Pittsburgh, PA (under which WPC agreed to pay $250,000 per occurrence).[12] As a practical matter, what this means is that WPC cannot compel OneBeacon (or Federal or CNA) to pay more than their pure pro rata share of any given claim unless and until the credit is exhausted—which may be never.

As explained below, not only are the foregoing cases factually distinguishable from the instant case, they incorrectly predict Ohio law with respect to contribution. Moreover, to the extent that they are applicable (which they are not), they would completely exonerate OneBeacon from

---

a limitation did not exist at common law, or in this case, because equity did not permit contribution between joint tortfeasors. *Henry v. Consol. Stores Int'l. Corp.*, 89 Ohio App.3d 417, 421-423, 624 N.E.2d 796 (10th Dist. 1993). Accordingly, any discussion of statutory joint tortfeasor contribution is inapposite to the issues at hand.

[11] In so holding, *Gencorp* (at p. 8) relied upon *Fulmer v. Insura Prop. & Cas.*, 94 Ohio St.3d 85, 2002-Ohio-64. In *Fulmer*, in an analogous context, the Supreme Court of Ohio noted that if the insured settled with an insurer for a very small amount, the insured would remain responsible for the difference between the settlement amount and the limits of the settling insurer's policy. 94 Ohio St.3d at 96. The high court held that such a rule provides a powerful incentive for an insured to be very careful about settling with insurers for less than the full value of the insured's claims. Other insurers will not be required to pick up the difference.

[12] OneBeacon's MSJ, p. 6.

any further liability in this case. For the reasons that follow, the Later-Settling Insurers' arguments fail.

First, as explained above, the foregoing federal cases are factually distinguishable from this case. Rather than being a "non-settling insurer[]", as alleged by the Later-Settling Insurers, it is uncontroverted (and incontrovertible) that OneBeacon has settled $81 million in defense and indemnity payments for asbestos claims on behalf of WPC. Thus, unlike the foregoing federal cases, OneBeacon is not the last insurer standing looking to undo the poor decisions it has made to equalize legal responsibility for WPC's defense and indemnity. Rather, OneBeacon was the first insurer to stand with WPC. It is now simply looking for contribution from others. Its contribution claims were fully accrued, and had been filed and litigated by the time that the Later Settlement Agreement was consummated.

Second, the Later Settlement Agreement effectively imposes a pure pro rata allocation across the mid-level excess layer thereby mooting WPC's continuing efforts to retroactively reallocate these amounts. In this regard, the federal cases upon which the Later-Settling Insurers rely, to the extent they have any weight at all, hold that OneBeacon is entitled to settlement credits "as though [WPC] had received the maximally obtainable amount" from the Later-Settling Insurers—that is, policy limits plus defense costs. In this case, that amount is at least $124 million across the mid-level excess policies issued by the Later-Settling Insurers **_PLUS_** an unaggregated $1 million per occurrence under the 1977-1978 policy issued by National Union Fire Insurance Company of Pittsburgh, PA (under which WPC agreed to pay $250,000 per occurrence). Even if WPC is permitted to apply "vertical exhaustion" to OneBeacon's excess policies (which should not be allowed for the reasons set forth in OneBeacon's Motion for Summary Judgment), OneBeacon would be entitled to this vast credit for any and all amounts in excess of its pure pro

–35–

rata share until the credit is exhausted (which may be never). Accordingly, the Later Settlement Agreement has effectively mooted any further argument regarding allocation with respect to the OneBeacon excess policies because it is no longer possible for WPC to "spike" these policies for 100% of any particular claim.[13]

Third, the foregoing federal cases wrongly predicted Ohio law with respect to contribution.[14] Simply put, there is nothing that the Later-Settling Insurers or WPC can do that can bar OneBeacon's accrued contribution rights in the manner argued. This inexorable conclusion arises from the equitable nature of all sums allocation and concomitant insurer contribution. See *Pa. Gen.*, 2010-Ohio-2745, ¶19 (holding that "the all-sums allocation method established in *Goodyear* is a remedy that is equitable in nature").

In this regard, as conceded by the Later-Settling Insurers at pp. 4-5 of their Motion for Summary Judgment, OneBeacon's contribution rights "do not arise from and are not affected by any contractual relationship between" WPC and the Later-Settling Insurers. Rather, as explained in *Pa. Gen. Ins. Co. v. Park-Ohio Industries*, 179 Ohio App.3d 385, 2008-Ohio-5991, ¶39:

> To allow the insured to unilaterally extinguish all potential sources of contribution renders illusory the right of contribution established in *Goodyear*. We do not believe that it was the intention of *Goodyear* to condition a targeted insurer's right to contribution on the action or inaction of the insured and leave the targeted insurer without recourse.

The Supreme Court of Ohio echoed these sentiments when affirming the decision, holding that the

---

[13] OneBeacon recognizes that the Later Settlement Agreement is not a fait accompli. It is not yet in effect and can be terminated very easily by either side as explained above.

[14] This is not uncommon. Federal courts frequently wrongly predict novel state law issues. For instance, in *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 689 (6th Cir. 2000), the Sixth Circuit wrongly predicted that Ohio would adopt horizontal allocation, but two years later in *Goodyear* all sums allocation was generally adopted (where policy language permitted it). This is why federal courts are encouraged to certify novel state law issues to state supreme courts for resolution. *See Lehman Bros. v. Schein*, 416 U.S. 386, 390, 94 S.Ct. 1714 (1974).

–36–

insured may not "engage in tactics to delay or obstruct the targeted insurer in the process of obtaining contribution from the nontargeted insurers." 2010-Ohio-2745, ¶19.

In making these pronouncements, Ohio courts did not invent a new area of insurance law, but rather relied upon well-established rules of equity followed by courts across the country for centuries. See *Pa. Gen.*, 2008-Ohio-5991, ¶21; *Resco Holdings, LLC v. AIU Ins. Co.*, 8th Dist. No. 106234, 2018-Ohio-2844, ¶¶11-12; *Camp v. Bostwick*, 20 Ohio St. 337 (1870); *Lestorti v. DeLeo*, 298 Conn. 466, 4 A.3d 269 (2010). These rules of equity are "broad" and are to "be liberally applied". *Pa. Gen.*, 2008-Ohio-5991, ¶21.

The Supreme Court of Ohio (drawing upon cases from across the nation) explained the genesis of these principles as follows:

> [T]he doctrine of contribution has its origin in the relation of co-sureties or other joint promisors in the same degree of obligation. It is not founded upon the contract of suretyship . . . It is an equity which springs up at the time the relation is entered into, and ripens into a cause of action when one surety pays more than his proportion of the debt . . . From this relation the common law implies a promise to contribute in case of unequal payments by co-sureties. But equity resorts to no such fiction. It equalizes burdens and recognizes and enforces the reasonable expectations of co-sureties because it just and right in good morals, and not because of any supposed promise between them. This equity, having once arisen between co-sureties, this reasonable expectation that each will bear his share of the burden is, as it were, a vested right in each, and remains for his protection until he is released from all his liability in excess of his ratable share of the burden. Neither the creditor, the principal, the statute of limitations, nor the death of a party, can take it away.

*Camp*, 20 Ohio St. at 346-347 (citations omitted).

Relying upon the same equitable principles in the context of co-guarantors of a mortgage loan, the Supreme Court of Connecticut persuasively explained:

> The only parties to this implied contract are the co-guarantors. The creditor is not a party. Indeed, "[t]he creditor has nothing to do with the right of the [co-guarantors] for contribution among themselves, and as no right to do any act tending to impair it." 18 Am.Jur.2d 42, Contribution §32 (2004).

–37–

> Accordingly, "the discharge of one [co-guarantor's] direct liability to the [creditor] will not relieve [him or her] from his or her liability to contribute to the other [co-guarantors] . . . whether the discharge results from contract or from operation of law." . . .

> * * *

> [U]nder an implied contract theory, a creditor cannot unilaterally impair the right of contribution between co-guarantors because the creditor is not a party to the contract. Because the right of contribution is not affected by the creditor's actions, a guarantor's duties are not discharged when the creditor releases a co-guarantor or allows the statute of limitations to expire as to a co-guarantor.

*Lestorti*, 298 Conn. at 473-480.

Under such principles, in *Pa. Gen.*, the Supreme Court of Ohio held that an insured's failure to give notice of an asbestos claim and tender the same to a "non-targeted" insurer did not bar the "targeted" insurer's contribution claim, even though notice and tender were preconditions of coverage under the non-targeted insurer's policy. *Pa. Gen.*, 2010-Ohio-2745, ¶¶11-24. Ohio's high court found that this holding was:

> . . . the natural result of *Goodyear*'s all-sums approach, which was designed to streamline the recovery process for the insured by permitting the insured to choose one primary targeted insurer with which to deal during the litigation. The decision in *Goodyear* presupposes that some insurers might not receive an opportunity to sit at the negotiation table and that those insurers must wait for a resolution in the underlying case.

2010-Ohio-2745, ¶21. Thus, an insured's failure to comply with express preconditions of coverage under non-targeted insurers' policies did not bar a targeted insurer's contribution claims against the non-targeted insurers.[15]

---

[15] Ironically, in light of the Later-Settling Insurers' arguments in this case, the Eighth Appellate District found that the protection of the targeted insurer's contribution rights was designed to encourage prompt settlements by the "targeted" insurer:

> [W]e do not want to discourage prompt settlement of insurance claims. To hold that [the targeted insurer] should not have made any payments to [the

–38–

Similarly, in *Foremost Ins. Co. v. Motorists Mut. Ins. Co.*, 167 Ohio App.3d 198, 2006-Ohio-3022, the Ohio court of appeals allowed an earlier-settling co-insurer to obtain contribution against a later-settling co-insurer despite their respective settlement agreements with the insured. Foremost was a personal auto insurer which paid $487,500 in uninsured/underinsured motorists ("UM/UIM") coverage to its insured for an auto accident. Thereafter, the insured filed suit against Motorists, which provided UM/UIM coverage to the insured's employer, seeking additional UM/UIM coverage for the accident. The claim against Motorists was settled for an additional $200,000 paid to the insured. 2006-Ohio-3022, ¶¶1-5. After Motorists settled, Foremost filed suit against Motorists for equitable contribution. Motorists argued that Foremost was not entitled to equitable contribution because both insurers had settled with the insured, but the court of appeals rejected Motorists' argument and affirmed judgment in favor of Foremost for equitable contribution. 2006-Ohio-3022, ¶¶33-39. The Supreme Court of Ohio then refused jurisdiction over Motorists' appeal leaving the court of appeals ruling in place. See 111 Ohio St.3d 1434. Based upon the foregoing, an insurer cannot evade an accrued contribution claim by settling with the insured.

Likewise, in *Camp*, the Supreme Court of Ohio held that a joint debtor who paid more than his fair share was not barred from seeking contribution against the estate of another joint debtor even through the contribution plaintiff failed to present his claim against the estate within the time

---

insured] unless and until all other potentially triggered insurers had been identified and notified . . . would discourage prompt resolution of these claims by the insurers. In future cases, the targeted insurer would be reluctant to resolve the claim until all other potentially triggered insurers had been identified and notified about the claim. This would delay or prevent settlements that would otherwise occur, contrary to the intent of *Goodyear* and the all-sums approach.

2008-Ohio-5991, ¶39.

required by law. The high court found that the contribution claim did not accrue until after the contribution plaintiff paid more than his fair share (nearly 8 years after the death of the joint debtor) and equity demanded that the claim be allowed even in the face of a statute of limitations defense. 20 Ohio St. at 346-348. *Camp* continues to be cited as good law across Ohio in a variety of contribution contexts. See *Shively v. MPW Industrial Water Serv., Inc.*, No. 2:10cv00010, 2010 WL 2696806 (S.D. Ohio 2010), *4; *Vittelli v. Vittelli*, 2d Dist. No. 96-CA-80, 1997 WL 101927, *2; *Garg v. Nielsen*, 9th Dist. No. 2628, 1991 WL 259528, *3. Thus, a contribution claim is not barred even where a legal claim may be barred by a statute of limitations. See also *Lestorti*, 298 Conn. 473-480.

Based upon all of the foregoing, OneBeacon's accrued contribution claims are unaffected by the Later Settlement Agreement. However, if *GenCorp*, *Bondex* and *OneBeacon* are found to govern, then they stand for the proposition that OneBeacon (and Federal and CNA) are entitled to a settlement credit of at least $124 million across the mid-level excess policies issued by the Later-Settling Insurers __*PLUS*__ an unaggregated $1 million per occurrence under the 1977-1978 policy issued by National Union Fire Insurance Company of Pittsburgh, PA (under which WPC agreed to pay $250,000 per occurrence). Accordingly, to the extent that OneBeacon's excess policies are triggered at all, WPC cannot allocate more than OneBeacon's pure pro rata share to them thereby mooting the remainder of the claims WPC has brought against OneBeacon. All sums allocation against OneBeacon is impossible in the face of the Later Settlement Agreement.

Thus, it can be fairly easily established that the *GenCorp*, *Bondex* and *OneBeacon* were not an accurate prediction of Ohio law and that there is nothing that WPC or the Later-Settling Insurers could do that could impair OneBeacon's vested contribution rights. However, to the extent that *GenCorp*, *Bondex* and *OneBeacon* are considered applicable to this case, OneBeacon

supplements its summary judgment argument to incorporate them and requests dismissal of all of WPC's claims against OneBeacon as a result of the Later Settlement Agreement.

In its Brief in Opposition to the Later-Settling Insurers' summary judgment motion, OneBeacon cited to the same *GenCorp*, *Bondex* and *OneBeacon* cases that the Later-Settling Insurers cited in support for their argument that they are entitled to settlement protection for the simple proposition that WPC will be held to the deal it struck and be responsible for the maximum amount of coverage that was available under the settled policies in any contribution action. OneBeacon (and Federal) set forth at length the language from those cases supporting that proposition and the Later-Settling Insurers cannot dispute that those cases are correctly cited. Instead, they make the bald assertion that because they will pay their "fair share or more" OneBeacon is not entitled to the settlement credit that must be given. The Later-Settling Insurers cite no language from those cases indicating that they somehow do not support the proposition they were cited for. The Court just needs to read these cases to see that the Later-Settling Insurers' argument is nothing more than a "because I say so" argument that should be rejected out of hand.

Finally, the Later-Settling Insurers do not address, and thereby concede, OneBeacon's argument that its vested rights to contribution for amounts it paid to settle past claims cannot be undermined by the Settling Agreement. OneBeacon and Federal set forth arguments in their respective Briefs in Opposition to the Settling Insurers' summary judgment motion demonstrating that their vested contribution rights for amounts paid to settle past claims cannot be undermined by the Settling Agreement. The Settling Insurers never responses to these arguments, and they are therefore conceded.

**E.    The Directed Verdict Standard**

Civ. R. 50(A)(4) provides:

–41–

> When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

In *Wagner v Roche Labs*, 77 Ohio St. 3d 116, 119, 671 N.E.2d 252 (1996), the Ohio Supreme Court explained:

> The law in Ohio regarding directed verdicts is well formulated. In addition to Civ.R. 50(A), it is well established that the court must neither consider the weight of the evidence nor the credibility of the witnesses in disposing of a directed verdict motion. * * * Thus, 'if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied. …
>
> "A motion for directed verdict * * * does not present factual issues, but a question of law, even though in deciding such a motion, it is necessary to review and consider the evidence." *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896, paragraph three of the syllabus.
>
> "When a motion for a directed verdict is entered, what is being tested is a question of law; that is, the legal sufficiency of the evidence to take the case to the jury. This does not involve weighing the evidence or trying the credibility of witnesses. * * * The 'reasonable minds' test of Civ.R. 50(A)(4) calls upon the court only to determine whether there exists any evidence of substantial probative value in support of [the claims of the party against whom the motion is directed]. * * * A motion for a directed verdict raises a question of law because it examines the materiality of the evidence, as opposed to the conclusions to be drawn from the evidence." *Ruta v. Breckenridge-Remy Co.* (1982), 69 Ohio St.2d 66, 68-69, 23 O.O.3d 115, 116-117, 430 N.E.2d 935, 938.

## IV.    Conclusion

This is no longer the case that was filed in 2011.  Nor is the case upon which summary judgment was entered in 2013.  With OneBeacon's primary insurance exhausted, this case has become about whether and to what extent WPC's excess insurance is now triggered.

The undisputed facts and controlling legal authority provide that the NUFIC Policy

–42–

constitutes "underlying insurance" that must be exhausted before the OneBeacon excess policies

can be triggered. Accordingly, any allocation claim with respect to the OneBeacon primary

policies is moot (because they are exhausted) and any allocation claim with respect to the

OneBeacon excess policies must fail (because they are not triggered). Simply put, OneBeacon has

fulfilled its obligations to WPC and now it is someone else's turn. Finally, OneBeacon is entitled

to contribution from both WPC (with respect to its SIR) and the Later-Settling Insurers, as their

settlement cannot eliminate OneBeacon's vested contribution rights.

Respectfully submitted,

/s/ Richard M. Garner
RICHARD M. GARNER (0061734)
SUNNY L. HORACEK (0089178)
**COLLINS, ROCHE, UTLEY & GARNER, LLC**
655 Metro Place South, Suite 200
Dublin, Ohio 43017
Phone: (614) 901-9600
Email: rgarner@cruglaw.com
          shoracek@cruglaw.com
*Attorneys for Defendant*
*OneBeacon Insurance Company*

## CERTIFICATE OF SERVICE

I certify that a true and exact copy of the foregoing was served via electronic mail,
pursuant to Ohio R. Civ. P. 5(B)(2)(f) on August 27th, 2018 upon the following:

| | |
|---|---|
| Daniel J. Buckley, Esq. - *djbuckley@vorys.com* <br> Joseph M. Brunner, Esq. - *jmbrunner@vorys.com* <br> David F. Hine, Esq. - *dfhine@vorys.com* <br> Vorys Sater Seymour and Pease, LLP <br> 301 East Fourth Street, Suite 3500 <br> Cincinnati, OH 45202 <br><br> *Counsel for Plaintiff The William Powell Co.* | Jeffrey R. Teeters <br> WOOD & LAMPING LLP <br> 600 Vine St., Ste. 2500 <br> Cincinnati, OH 45202 <br> Telephone: (513) 852-6050 <br> Facsimile: (513) 419-6450 <br> jrteeters@woodlamping.com <br><br> -and- <br><br> James Sanders (PHV – 19116-2018) <br> Matthew Dostal (PHV – 19117-2018) |

–43–

| | Clyde & Co US LLP<br>55 West Monroe Street, Suite 3000<br>Chicago, Illinois 60603<br>Telephone: 312-635-7000<br>Fax: 312-635-6950<br>jamie.sanders@clydeco.us<br>matthew.dostal@clydeco.us<br><br>*Counsel for Defendant Continental Casualty Company* |
|---|---|
| Michael M. Mahon - *MMahon@Reminger.com*<br>Reminger Co., LPA<br>525 Vine St., Suite 1700<br>Cincinnati, OH 45202<br><br>And<br><br>Stefano V. Calogero- *scalogero@windelsmarx.com*<br>Windels Marx Lane & Mittendorf, LLP<br>One Giralda Farms<br>Madison, NJ 07940<br>*Counsel for Allstate Insurance Company* | Gregory A. Harrison, Esq.- *Greg.Harrison@Dinsmore.com*<br>Dinsmore & Shohl LLP<br>255 E. Fifth Street, Suite 1900<br>Cincinnati, OH 45202<br><br>And<br><br>Edward Parks - *eparks@goodwin.com*<br>Shipman & Goodwin LLP<br>1875 K Street NW, Suite 600<br>Washington, DC 20006<br><br>*Counsel for Great American Insurance Company of New York* |
| Daniel F. Gourash, Esq. - *dfgourash@sseg-law.com*<br>Robert D. Anderele, Esq.- *rdanderle@sseg-law.com*<br>Seeley, Savide, Ebert & Gourash Co., L.P.A.<br>26600 Detroit Road<br>Cleveland, OH 44145<br><br>*Counsel for Federal Insurance Company* | Laura Megan Faust - *lfaust@ralaw.com*<br>Roetzel & Andress, LPA<br>222 W. Main Street, Suite 400<br>Akron, Ohio 44308<br><br>*Counsel for National Surety Corp.* |
| James P. Nolan, II - *jnolan@rolfeshenry.com*<br>Peter A. Schmid - pschmid@rolfeshenry.com<br>Gerald V. Southard - *gsouthard@rolfeshenry.com*<br>Rolfes Henry | James J. Hickey -*James.Hickey@kennedyscmk.com*<br>Kennedys<br>100 North Riverside Plaza<br>Suite 2100<br>Chicago, Illinois 60606<br>Chicago, IL 60606 |

| | |
|---|---|
| 600 Vine St., Suite 2600<br>Cincinnati, OH 45202<br><br>*Counsel for State Auto Mutual Insurance Company* | *Counsel for United States Fire Insurance Company* |
| Ronald B. Lee - *rlee@ralaw.com*<br>Roetzel & Andress, LPA<br>222 South Main Street<br>Akron, OH 44308<br><br>And<br><br>John C. Sullivan - *jsullivan@postschell.com*<br>Allison R. Radocha - *aradocha@postschell.com*<br>Post & Shell, P.C.<br>Four Penn Center<br>1600 John F. Kennedy Blvd.<br>Philadelphia, PA 19103<br><br>*Counsel for National Union Fire Insurance Company of Pittsburgh, PA* | John J. Garvey III - *jgarvey@gsn-law.com*<br>Jason E. Abeln - *jabeln@gsn-law.com*<br>Garvey Shearer Nordstrom, PSC<br>2400 Chamber Center Drive, Suite 210<br>Ft. Mitchell, KY 41019<br><br>And<br><br>Dena Economou -- *deconomou@karballaw.com*<br>Karbal, Cohen, Economou, Silk, Dunne, LLC<br>150 W. Wacker Drive<br>Suite 1700<br>Chicago, IL 60606<br><br>*Counsel for Hartford Accident and Indemnity Company* |

*/s/ Richard M. Garner*
**RICHARD M. GARNER (0061734)**
**SUNNY L. HORACEK (0089178)**